## W. C. F. REICHENBACH ET AL. v. MARY G. RUDDACH.

### ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF PHILADELPHIA COUNTY.

Argued January 10, 1889—Decided October 7, 1889.

[To be reported.]

(a) In an issue devisavit vel non, raising the questions of testamentary capacity and undue influence, after testimony sustaining the alleged will, there was much testimony tending to establish that though the deceased in early life was of excellent mind, culture and deportment, yet in his later years he was addicted to drunkenness, profligacy and sexual excesses:

(b) That within three months before the alleged will was executed, his mental powers had become so impaired by his profligate habits that he was then in such a condition of chronic alcoholic insanity, with dementia, that, in the judgment of medical witnesses and experts, it was almost impossible there should be a recovery with mental capacity:

(c) That for several years, and up to the time when she became his wife, the deceased had been living with the sole beneficiary under his will, as his mistress; that the marriage was suggested to him by another and was performed in the house of the beneficiary, where the will was executed on the second day thereafter, and where the testator died on the third day.

1. The record of a hospital for the insane, indicating that the testator's father, thirty-eight years before, was admitted to the hospital because of intemperance, continued for six months and resulting in melancholia, was inadmissible, when there was no proof or offer of proof that the species of melancholia with which the father was affected was transmissible by inheritance.

2. It was error, under the testimony in the case, to charge the jury in affirmance of a point by the proponent, that there was no sufficient evidence of general insanity of the deceased, and that therefore the burden of proof was upon the contestants to show the existence of testamentary capacity at the very moment of the execution of the will.

3. The testimony upon the subject of the previous condition of the testator

should have been submitted to the jury, with instructions that if it failed to satisfy them that there was a condition of general insanity at any time before the will was made, then the burden of proof of testamentary incapacity at the time of execution was on the contestants.

4. The language of a point to the effect that if the jury found from all the evidence in the case that there was such imbecility of intellect as "rendered the testator incapable of appreciating, knowing, remembering, and calling to mind the value and extent of his property, at the time of making and executing said will," was entirely too broad.

5. A disposing mind and memory is one in which the testator is shown to have had, at the making and execution of a last will, a full and intelligent, consciousness of the nature and effect of the act he was engaged in; a full knowledge of the property he possessed, and an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty.

6. It was error to refuse instruction requested, that the jury might take into consideration "the state and condition of mind of the testator," at the time of making and executing the will, "the condition and relative situation of the testator and the proponent, the situation, surroundings, and condition of the testator himself, the nature and extent of his property, all the circumstances under which the will was made and the provisions of the will itself."

7. While in the present case, the fact that a marriage had taken place prior to the will, relieved the proponent from the rule of Dean v. Negley, 41 Pa. 312, as to undue influence of a mistress, it did not relieve the testamentary act from the imputation of a continuance and a present exertion of an undue influence, if the jury in view of all the facts inclined to such a belief.

8. It is not true, in law, that one who has merely "given indications of mental unsoundness" is not at liberty to do what he likes with his own, or that in such case "every sign of partiality or injustice must be viewed with strong suspicion;" indications of insanity do not constitute testamentary incapacity, and Dr. Ray's report in Pidcock v. Potter, 68 Pa. 353, is not the opinion of the court.

9. There was no relevancy or legal propriety in suggesting by a point a limit of time within which a radical change from a condition of testamentary incapacity might not take place, when there was abundance of testimony as to what the actual condition of the testator was at the end of that period, and ample opportunity to deliver direct testimony on the subject.

10. If the testimony upon one side of a controverted question of fact is made prominent and conspicuous in the charge to a jury, common fairness requires that equal prominence should be given to opposing testimony having a contrary tendency, and the giving of such undue prominence to one side of the cause is ground for reversal.

11. Averments of testamentary incapacity or undue influence need not be established by positive evidence as distinguished from circumstantial; it was error therefore, to charge in this case that the presumption, where

a will was duly executed by a person of full age, that he was competent and not unduly influenced, must be overcome, not by doubtful testimony, but by positive evidence.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 150 July Term 1887, Sup. Ct.; court below, No. 490 December Term 1885, C. P. No. 1.

On January 2, 1886, there was filed a precept for an issue from the register of wills, to determine: (1) whether or not at the time of the execution of a certain alleged will, dated November 15, 1884, William H. Ruddach, the testator, since deceased, was of sound and disposing mind, memory and understanding; and (2) whether or not the said alleged will was made by reason of undue influence exercised over the mind of said William H. Ruddach, deceased. The issue was in the ordinary form, and Mary G. Ruddach, executrix of said alleged will was made plaintiff, and William C. F. Reichenbach, a legatee and devisee under an alleged will of a prior date, George J. Ruddach, Mary Robinson, Edmund Ruddach, and a number of others, were made defendants.

At the trial on February 9, 1887, the plaintiff called the subscribing witnesses, four in number. The first two of them proved the execution of the will, dated November 15, 1884, and stated, in reply to questions propounded by plaintiff's counsel, that at the time Dr. Ruddach executed the will he was of sound and disposing mind, memory and understanding. These witnesses were then subjected to a rigid cross-examination by the defendants' counsel upon the subject of the testator's testamentary capacity. The plaintiff then called the other two subscribing witnesses and after proving the execution of the will, rested. Thereupon the defendants' counsel gave notice that as the plaintiff had undertaken to prove the affirmative of the issue upon the question of testamentary capacity, and had examined two of the subscribing witnesses but had not deemed it wise to examine the other subscribing witnesses upon that subject, the defendants would object to the re-opening of the plaintiff's case thereon at a later date. The next morning the question was ruled:

By the court, BIDDLE, J.:

I did not decide this question yesterday, not from any doubt in my own mind, but because the hour of adjournment had arrived, and I wanted to read more carefully the decision of my own court in this case. I have had the advantage of reading the opinion referred to very carefully since, and I have had the additional very great advantage of consulting my colleague, Judge ALLISON, who delivered the opinion of the court, that I might find from him whether he had any different understanding of what the court decided than I had. I find that he entirely concurs with me. The theory that we promulgated then was, that the proper mode of trying a case of this sort was that the party plaintiff to such action must of necessity, it seems to us, be the party who seeks to establish the will, which is accomplished when the due and formal execution of the writing has been proved by the testimony of the subscribing witnesses, or by proving their signatures if they are dead or cannot be found, or if there be no subscribing witnesses, then by due proof by at least two witnesses of the signature of the testator. We hold that the proponent of the will has a right to prove the will in that way, and to rest, and that the defendant has no right to cross-examination except upon the due execution of the instrument. To our mind, it is exactly like a promissory note or a mortgage. If you choose to produce your promissory note, and prove the execution of the note and rest, that is all you have to do. If, instead of doing that, however, you choose to go into the consideration of the note, and then the defendant, alleging that it is an accommodation note, goes into his evidence on that subject, you are debarred from going back again, after that testimony has been delivered, to further proof of the original consideration. We know perfectly well that that is the undoubted rule in regard to the admission of evidence. You seem to think that there is an exception in this case, because in the register's office, there is some form by which a man expresses his opinion as to the sanity of a testator. I do not think that has anything to do with the present question; but, admitting that it has, then your position, as I understand it, is that it is your duty not only to prove the formal execution of the will but the sanity of the testator. That being your position, if it is your duty to prove

the sanity, you must go on and prove it. Is there any law which decides that you can partially prove, and then admit the defence, and go on and subsequently attempt to prove it? If the obligation is upon you, as you seem to think, to prove sanity, then you must do it at the time you propose your will. I do not think that it is at all incumbent upon you; but if you choose to do it, it is your own choice, and, of course, you will have to abide by it. I have never, myself, been able to see the mystery of trying a will case more than any other issue which we try here from morning to night. It is subject to exactly the same rules, and therefore, if you desire to add anything more, I would not consider the case closed as against you. I do not think you are bound by the fact that you closed your case, as the other side very fairly gave you notice what the effect of it would be, and I think if you desire to re-open and give all the evidence that you have on that point, I shall cheerfully acquiesce in it.

.The plaintiff's counsel then asked permission to withdraw the questions put to their two subscribing witnesses upon the testamentary capacity of the testator, on the ground that they were merely formal. This the court refused, referring to the protracted cross-examination upon the subject which had resulted, and required, under exception sealed, that plaintiff put in the whole of her proof in chief upon the question of testamentary capacity.

The plaintiff then called a large number of witnesses whose testimony, it was claimed, established the following facts:

Dr. Wm. H. Ruddach, whose will was the subject of controversy, was born October 15, 1825. From his youth he cared nothing for society, avoiding even the social gatherings at his father's house. He was moody and uncommunicative, except when in his cups. In these respects he was eccentric and so continued until his death. He became acquainted with Mary G. Greusser, the plaintiff in the issue, when she was but a girl, and wanted to marry her twenty years before the marriage actually took place, and before she married any other person, but she refused him and was married to a Mr. Dixon. Because of this Dr. Ruddach took to drinking, and from time to time went upon protracted periods of intoxication. When sober, he would speak of the plaintiff in the highest terms, and frequently said

that if she had married him he would never have become dissipated; he also said repeatedly that he would never marry any other person.

Miss Greusser's marriage with Mr. Dixon was an unhappy one, and after they lived for a short time together, she left him and returned to her mother's home. Thenceforward she supported herself as a saleswoman in a store. Shortly after her return home, Dr. Ruddach endeavored to renew his attentions toward her, and urged her to obtain a divorce from Mr. Dixon and to marry him. Being a Catholic, she refused the suggestion, as the law of her Church forbade it. During this time, which was almost continuous for ten or fifteen years before his death, he was boarding with her mother, and would meet her at the store where she was employed and escort her to her home. He frequently told others of his wishes in this regard, and tried to obtain their assistance in his behalf.

On January 26, 1884, Dr. Ruddach made a will, in which a relative, Nicholas Huppman, was the principal beneficiary. Huppman died on March 21, 1884, and on March 24th, Dr. Ruddach executed a codicil to said will reciting the fact and constituting W. C. F. Reichenbach, one of the defendants in this issue, his principal beneficiary. At the execution of that will and codicil, Dr. Ruddach, as testified by the subscribing witnesses thereto, was entirely competent.

At April Term, 1884, of the Sessions, Dr. Ruddach was a member of the grand jury of the county, attended every day of its sessions, nineteen in all, and was thoroughly careful, competent and intelligent in all that he did. In May, 1884, he was arrested upon the charge of procuring an abortion, and bound over to appear at court. This matter was a cause of much annoyance to him, and he went off on a debauch. On July 3, 1884, the indictment was returned, not a true bill, by the grand jury. On the same day Dr. Ruddach voluntarily went to St Joseph's Hospital.

At that place, in keeping, as was claimed, with his previous conduct, he refused to have much to say to the attendants, or to the physician, Dr. Cruice; but whenever his friends called, he recognized them and conversed with them intelligently about past and present events, about business, his investments, and other matters of interest to him. While at the hospital,

he received liquor and opiates. When he thought he had sufficiently recovered from his debauch, he voluntarily left the hospital, and on July 17, 1884, returned to his boarding house. When he reached home, Dr. Price, his attending physician, visited him and found him perfectly intelligent and was told by him what medicine he could, and what he could not take. Between that time and August 26, 1884, he remained boarding with plaintiff's mother, and went about his business, consulting with Messrs. Sylvester, who attended to his investments, collecting and depositing his income, and drawing such moneys as he needed from time to time.

Late at night on August 26, 1884, he went alone to the Union street station house, and requested to be allowed to stay there during the night. At that time he had been taking chloral or opiates. He was accused of taking chloral, but denied it, and said he had been taking opiates. The opiates had stupefied him. The lieutenant of police conceived the idea that he ought to be confined, and had him examined by two physicians. The physicians refused to certify that they thought him insane, but recommended that he go to Burn Brae. He refused to go to Burn Brae, and sent for Dr. Price, his physician, giving his name and address accurately. Dr. Price stated, when he came, that he needed rest only, and absence from drink, and it was recommended that he be taken to the West Philadelphia branch of the Pennsylvania Hospital. He consented to go as a voluntary patient, to leave when he pleased, and went there on August 27, 1884.

While at this hospital, Dr. Ruddach would have but little to say to the attendants, but conversed freely and intelligently with his friends. Dr. S. Preston Jones was the physician in charge, but saw but little of him. While there he was given liquor and opiates. He left the hospital September 2, 1884, and returned to his boarding house. On his way returning he conversed intelligently about his condition. Subsequently he called up of himself the sum which had been paid for the carriage, and paid over the amount.

Mr. Dixon had died on July 4, 1884. Soon after, Dr. Ruddach renewed his importunities that the plaintiff would marry him. She refused on account of his illness, desiring that he would wait until he got well. He urged her for his sake to

marry him, telling her that she would wait until it was too late. At this time he desired to execute a will in favor of the plaintiff, and requested the Messrs. Sylvester to call and prepare it, but out of caution and knowing his previous dissolute life and believing there would be a law-suit after his death, they ignored his request, though they did not doubt his entire competency. The plaintiff not acceding to his request for an immediate marriage, he went to the Delaware House on September 20, 1884. While there he was taking chloral and opiates. With the other boarders he would have no intimacy, but with the friends that called and with his physician he was always intelligent. To avoid requests to give or loan money, he told that he was poor. He left the Delaware House on September 24, 1884, returned to his boarding house, and remained there as at his home until his death. He was out and around visiting friends and neighbors, and receiving return visits. He conversed intelligently, transacted his usual business, and gave minute and careful directions about his investments and securities.

He had frequently spoken to Wm. D. Fortin about getting some one to draw his will for him, but Mr. Fortin, thinking there was no hurry, did not concern himself about it, but about November 1, 1884, he spoke to Mr. J. Alexander Simpson, a member of the bar, on the subject, and on November 11, 1884, requested Mr. Simpson to go to Dr. Ruddach's house for that purpose. On November 13th, Mr. Simpson and Mr. Fortin went together to call upon Dr. Ruddach. Mr. Simpson had never met Dr. Ruddach, and on the way he inferred from some remark made by Dr. Fortin that the relations between Dr. Ruddach and the plaintiff were illicit. After the introduction, Dr. Ruddach asked Mr. Simpson if he called professionally. Mr. Simpson said he did, and that the first advice he had to give was that they should get married. Dr. Ruddach said that was just what he had been wanting for some time. A number of things occurred at the interview in all which Dr. Ruddach acted and conversed intelligently. The plaintiff consented to the marriage, and the ceremony was performed in the presence of six witnesses. Afterwards, when all had left the room, Dr. Ruddach gave directions to Mr. Simpson for the preparation of his will, desiring that all his property be left to

his wife. Between that date and the execution of the will, he told a number of visitors of his marriage, and that he felt much better by reason thereof, and that he was expecting Mr. Simpson to come down with the will. He sent Mr. Fortin to hurry Mr. Simpson up. On November 15, 1884, Mr. Simpson called with the will; witnesses were sent for; the plaintiff was asked to leave the room, and the will was distinctly read to Dr. Ruddach in the presence of the four witnesses. He said it was just what he wanted and it was then executed and attested. After this, he told to several persons that he had made his will, and that his mind was at rest by reason thereof. The next day a relapse came, and he died. He was conscious to the last, spoke affectionately of his wife, and much regretted his past life.

During the time of his illness, he was visited by his friends and neighbors, and by but one relative, Mr. Wm. A. Ruddach, who against his interest testified that he was entirely competent. He refused to permit the plaintiff to write to his other relatives during his illness. He had unbounded confidence in the plaintiff, and frequently said he had intrusted her with large sums of money, as high as $60,000, and had never missed a cent of it. Except when intoxicated, and then only on a few occasions, he spoke of her in the highest terms. Dr. Price, the attending physician, visited him sixty-nine times from July 17, 1884, to the time of his death, and said that at all times he was competent to make a will, and that the effect of his past excesses was to injure the internal organs only, and not to affect his mind; that when not in liquor his mind was perfectly clear, and that towards the last, by reason of the supply of liquor being stopped, he was always clear and intelligent.

The case in chief of the plaintiff having closed, early in the defendants' case certain records of the Pennsylvania Hospital containing entries in regard to David J. Ruddach were produced:

Mr. Ashhurst: We propose to prove by the records of the Pennsylvania Hospital for the Insane that David J. Ruddach, the father of William H. Ruddach, the decedent, was committed to that hospital in 1849 as being insane, and that he died there, after a residence of two months; the said records containing the date of his admission, at whose application he was admitted, the cause of his confinement there and the history of the case,

being minutes of the corporation and ancient documents contemporaneously kept more than thirty years ago; the purpose of this offer being to show that the decedent derived an insane taint from an insane father.

The entries offered were as follows: "David J. Ruddach, merchant; admitted 1st month, 18, 1849; aged 55, native of Philadelphia; 1st attack, cause intemperance; duration of disease before admission, six months; form of mental disease, melancholia." . . . . . "David J. Ruddach discharged 3d month, 10, 1849; time of residence in hospital, 1 month 20 days: cause of discharge, death."

By the court: I do not see upon what ground the evidence is admissible in the case. There have been no grounds laid for its admission, and, if it were admitted, there would be no opportunity given to the other side for an investigation as to the circumstances of the case in order to ascertain whether David J. Ruddach, like his son, William H. Ruddach, had been a drunkard or dissipated man, or whether it was a case of hereditary insanity. I, therefore, sustain the objection and overrule the offer of the testimony; exception.[1]

The defendants then proceeded to adduce testimony from which it was claimed the following facts were established:

Dr. Ruddach was the son of David J. Ruddach, an old and well known merchant of the city. He received a careful school and collegiate education. While he was all his life somewhat eccentric and peculiar in his manner, he was noted for his gentlemanly deportment, and a certain elegance and old-fashioned courtesy of demeanor. By his father's death in 1849, he passed at once into the possession of a large inheritance, and soon afterward commenced a career of dissipation, but for many years, despite his dissolute habits, he retained the manners, appearance and behavior of the cultured gentleman. In the last years of his life, however, he sank into a condition of great physical and moral degradation. At his death, he left upwards of $50,000 of personal property, and real estate of which he was the owner in fee, of an annual rental value of $3,200. He left no relations on his father's side nearer than cousins. On his mother's side he left uncles, aunts and cousins, residing for the most part in Baltimore. He had little intercourse or intimacy with his paternal relatives, but with his

relations on his mother's side, residing in Baltimore, he had always kept up affectionate intercourse, particularly with his aunt, Mrs. Huppman and her children. Her son, his cousin, Nicholas Huppman, was his special and close friend in the family, and he had often planned the adoption of a son of Mr. Huppman as his heir. His affairs for many years, especial-ly the collections of his rents, had been in the hands of Mr. Anthony Snyder. Other real estate investments had been attended to for him by the Messrs. Sylvester, and Mr. D. R. Patterson had been his legal adviser as to such matters. He was attached to W. C. F. Reichenbach, one of the defendants, the son of his mother's housekeeper.

For many years prior to 1883 he had indulged in hard drinking and sexual excesses, and was also addicted to an undue use of drugs, such as chloral, etc. In the spring and summer of 1883, he showed moral deterioration and a change of habits, by open and notorious association with women of a low character, and by a general selection of companions of a different and lower class than that of those for whose intimacy his education and earlier habits had fitted him. In a letter to Nicholas Huppman he acknowledged that he was "morally, mentally and physically broken up." His language and behavior were violent, profane, boisterous, unnatural and disconnected; he was subject to delusions, both as to loss of sight, which was imaginary, and as to being followed and watched by unknown persons. His dress was slovenly, his appetite ravenous and ungovernable, and his manners at table and elsewhere unseemly. Notwithstanding, he seemed to retain in the strongest form his affection for his cousin Nicholas and the little boy, and toward the close of 1883 he made a will, which was formally executed on January 24, 1883, and in which after certain provisions for his friend and agent Mr. Snyder, and a cousin, Miss Frazier, an elderly lady who had long resided with his mother, and the Old Men's Home, the residue of his estate was given to Nicholas Huppman, subject to a gift of $15,000 to Wm. C. F. Reichenbach. Mr. Huppman died March 21, 1884, and on March 24th, Dr. Ruddach executed a codicil to his will adverting to that fact and substituting Mr. Reichenbach as his residuary legatee and devisee.

Dr. Ruddach had for many years been more or less intimate

with Mrs. Mary F. Dixon, whose husband was separated from her until his death in July, 1884. Witnesses for the defendant testified to Dr. Ruddach's complaints of her unkind treatment; her extravagance ; her desire to induce him to marry her, to which he would never consent, and his desire to be rid of her.

Between the summer of 1883 and May 1884, he drank and indulged in sexual excesses even more than ever before, having as many as thirteen mistresses and drinking as many as fifty glasses of liquor a day. In May he was arrested and bound over for bastardy and abortion. Though at a large outlay he had settled the prosecution, the charge greatly worried him, and the pain and distress of mind continued afterwards. In the latter part of June, 1884, he told an old friend that he had been robbed of $75,000 at the trust company, and that he had been hunted to death by a woman whom he characterized by a profane and opprobrious epithet. He was not then in liquor, but in a wild state ; clothes disordered and uncared for, absolutely changed from his former self.

On July 3, 1884, he was taken by a friend to St. Joseph's Hospital. He was then much emaciated and broken, and was suffering from chronic diarrhea. The diarrhea continued during his entire stay at the hospital, which he left on July 17th. The physician in charge testified that he was perfectly imbecile, and showed no indications of mental improvement. He gave no intelligent replies to the physicians and attendants, save that he had relatives in Baltimore. He did not dress or undress himself. In trying, at times, he would put his feet into his coat sleeves, his coat on over his shirt and drawers, without trousers, and put on his vest and long coat inside out.

On August 26, 1884, he went unaccompanied to a police station, to give himself up; he claimed that he was poor and had lost all his money, although at the time he had upwards of $1,100 in bank bills on his person. He allowed his money to be taken from him by the police lieutenant without objection, and was unable to give intelligent replies to the questions put to him by the officer, whom he knew and recognized. Two physicians examined him at the officer's request, and gave a certificate for his admission to the Burn Brae Institution for the Insane, but on August 27th he was taken to the Pennsylvania Hospital for the Insane.

The physicians in charge there stated that during his entire stay at this hospital he was insane, suffering from dementia, which apparently had been coming on him a long time. He was unable to give intelligent replies to the questions of physicians and attendants. At times he was noisy and boisterous. He did not sleep. He complained of being poor. He stood at times looking at the ceiling, imagining he saw persons there who wanted to shoot him, and would mutter unintelligibly. The physicians were positive he was not suffering from immediate alcoholism or delirium tremens, but was in a morbid condition, physical, moral and mental degradation and collapse, the result of his long career of drinking and dissipation.

On September 2, 1884, he was taken from the hospital by the plaintiff and her friends. On September 4th, he removed from his box in the Fidelity Company's office, mortgages, stocks, coupon bonds to the value of $10,000, and took them to the plaintiff's house and handed them to her, saying that they belonged to her, and that if she could not make use of them, to burn them up before she gave them up. On September 20th, he went to the Delaware Hotel. While there he imagined persons were hunting for him, to kidnap or arrest him; that he was poor and had lost all his money; complained of cold while the weather was warm, and tried to warm himself by a heater where there was no fire, etc., etc. From being a man of strong will he had become plastic and docile, and readily obeyed directions given him. On September 24th, he left the Delaware Hotel in the company of friends, who told him they would try and obtain employment for him in the business of one of them, a pawnbroker. He was taken to the house of the plaintiff where he remained until he died. Medical experts testified that in their opinions it was a moral impossibility that he could have recovered sufficiently to become capable of executing a will or transacting any business.

Towards the close of defendant's case, they called Dr. S. Preston Jones, who succeeded Dr. Kirkbride as chief of the Pennsylvania Hospital, and proved Dr. Kirkbride's handwriting to certain entries in the books of the institution formerly produced:

Mr. Ashhurst: I offer in evidence the entry in the book in the handwriting of Dr. Kirkbride, which has been identified

Charge of Court below.

by the witness, relating to the admission of David J. Ruddach, the father of Dr. William H. Ruddach, into that institution.

Objected to.

By the court: Objection sustained; exception.[2]

At the close of the case on the testimony, the court, BIDDLE, J., charged the jury:

It appears that on Saturday, the fifteenth day of November, 1884, Dr. William Ruddach executed a paper, which it is here contended was his last will and testament. That this paper was executed in the manner prescribed by our act of assembly cannot be, and is not controverted. It was signed by him at the end thereof, and is witnessed by four subscribing witnesses, which are two more than the act requires, so that its formal execution may be said to be established. It is contended, however, that, at the time he signed this paper, he was not of sound and disposing mind, memory and understanding; and, second, that, at the time he signed it, he was unduly influenced in the performance of that act. If you should find both or either one of these allegations to be true, it would invalidate the instrument, although all the formalities necessary to its execution should have been observed.

[The presumption, where a will is duly executed by a person of full age, is, that the testator is competent to make a will, and that he was not unduly influenced in the making of it. This must be overcome, not by doubtful testimony, but by positive evidence.] [17] A man of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, and an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. Or, to sum up the whole in the most simple and intelligent form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will?

Undue influence does not mean, legally, that influence which is acquired over a testator by acts of kindness or other acts of that character calculated to inspire affection and confidence. Neither does honest advice or suggestion. And it has even

Charge of Court below.

been held by our Supreme Court that one has a right, by fair argument or persuasion, to induce another to make a will in his favor. To constitute undue influence, in the language of Judge WOODWARD: "There must be a present constraint operating on the mind of the testator in the very act of making the instrument, and there must be some evidence tending legitimately to prove that some fraud had been practiced, at the time of making the will, or that some misrepresentation had been made, or that some physical or moral constraint had been employed, such as to destroy his free agency. Neither moral nor physical constraint is to be inferred from mental weakness alone. That undue influence which suffices to destroy an alleged will, is distinct from weakness and has no necessary connection with it." These principles, says Judge THOMPSON, are fully supported by the best authorities.

Dr. Ruddach, it appears by the will in question here, has left the whole of his property to his wife. He does not appear to have had any direct descendants, and those here disputing it are collateral relatives and legatees claiming under a former will. Mr. Reichenbach, who has been called a foster-brother in the discussion of the case, does not occupy that position, according to the usual understanding of that phrase. Foster-brothers are children of different parents, suckled by the same woman. Mr. Reichenbach was simply the son of the housekeeper of Dr. Ruddach's mother, and was brought up in the family.

That a man who marries should change any will made before that event, is of course very usual. In fact, if he does not do so, and dies, the widow can claim under the intestate act. The will of a single woman is revoked absolutely by her subsequent marriage. In the present case, Dr. Ruddach was married on the 13th of November, 1884, made his will on the 15th, and died on the 16th. The nearness of these events is naturally calculated to excite remark and to require explanation. The witnesses for the plaintiff explain it by saying that the person whom the doctor married had been known to him for many years, and that their earlier union was only prevented by the fact that her husband, who had deserted her, was still living; that being a Catholic, she was unwilling to avail herself of the law to obtain a divorce; that in July preceding

Dr. Ruddach's death, her husband had died, and their union was then postponed only on account of Dr. Ruddach's illness, and it was the suggestion of Mr. Simpson, who was sent for by the doctor to make his will, that it had better be preceded by the marriage. That the marriage ceremony was gone through with was testified to by the magistrate who performed it in the presence of Mr. and Mrs. Butcher, Peter Daley, Mr. Kessler and Mr. Simpson, Sr., who have all sworn that Dr. Ruddach was entirely conscious of what was going on and intelligently answered the questions which were addressed to him, and that neither the physician who attended him, nor any of his friends, anticipated that he would die so soon after it.

The plaintiff here, who represents the will, has not chosen to rely exclusively upon the presumption arising from the formal execution of the paper, but has also produced affirmative testimony to establish the fact that the testator was of sound disposing mind, memory and understanding at the time that he signed it. The will was an extremely simple one. To establish not only the execution of the will, but the condition of the testator's mind, the plaintiff has called Mr. J. Alexander Simpson, the lawyer who drew and witnessed the will, and Peter Daley, Nicholas Kessler and Mrs. Butcher, who appear as subscribing witnesses. They swear positively that the full contents of the will were made known to Dr. Ruddach, and that he was, in their opinion, in a condition of mind fully to understand it. Their cross-examination has been elaborate and exhaustive, and their previous testimony before the register gone over, and it is for you to say whether anything has been developed to cause you to believe that their testimony has been invalidated.

In addition to the subscribing witnesses to the will a number of others have been called, who have had a more or less extended acquaintance with or friendship with the doctor, and who, although they admit that he was more or less addicted to the use of liquor, do not consider that it ever disqualified him from the performance of the ordinary duties of life, or was ever carried to such an excess as to make him incapable of taking care of himself. Their reasons for this opinion have been thoroughly investigated, and it is for you to say whether it has shaken the faith in the justice of these conclusions. The mere

Charge of Court below.

fact that a man is addicted to drinking does not of itself disqualify him from making a will, if you believe that, at the time he made it, he was in a condition of mind to understand clearly the nature of the business in which he was engaged. Liquor affects people very differently, the capacity to resist its influence being very great in some and very small in others. Among the most important of these witnesses was of course Dr. Mordecai Price, a graduate of the University of Pennsylvania, and a practitioner of seventeen years' standing. He was called to attend Dr. Ruddach by Mr. Joseph Butcher. His attendance commenced on the 17th of July, 1884, and only ended with Dr. Ruddach's death. He testifies that, although he was a sick man, "his mind was always perfectly clear when you aroused him, even at his weakest and worst period; that towards the latter part of his life, he was freer from pain than before." These are the main features of the plaintiff's case, and if you should consider them established, would certainly constitute a valid disposition of his property.

The defence, as opened to you in this case, was, that it would be shown to you that Dr. Ruddach, so far from having any regard or esteem for Mrs. Dixon, whom he married, "hated, abhorred and detested her;" that the will devising to her this property was an infamous fraud perpetrated in a den in the lowest quarter of the city; that it was concocted by this woman, a negro politician, and a lawyer, Mr. Simpson, assisted by Mr. Daley, Mr. Kessler and an apostate cousin.

Denunciatory declamation is always very striking when well delivered, but in a court of justice, unless justified by adequate testimony it is entitled to no consideration. Can you find, then, in the present case, anything from the beginning to the end of it which satisfies your mind that Dr. Ruddach "hated, abhorred and detested" Mrs. Dixon? Is not the great weight of the testimony the other way?

It is quite remarkable to my mind, that in Dr. Ruddach's free and unconcealed reflections on the women he consorted with, she never seems to have been included in the same category with them. It is not pretended that she was one of the thirteen whom he numbered, or that she was one of the eight for whom Mr. Theodore H. Broughton furnished liquor by order of a gentleman he deemed out of his mind. Her appear-

ance seemed always to be to protect and guard him, and whatever he ever said disrespectful of her, struck me more as the petulance of one who resented anything like interference with his vices. [That she was always kind, attentive and devoted to him, seems to me to have been overwhelmingly established in this case.] [19] She performed the most menial services for him and seems to have been the only one who ever pretended to care for him, look after him, or to check his indulgences. I do not recall that any one has asserted that her influence over him was ever exerted except for his own good.

The testimony of the subscribing witnesses to his will, has not been attempted to be impeached by the evidence of persons who are willing to swear that they believed them to be unworthy of credit under oath. It is sought to discredit them by inducing the belief that the facts testified to by them could not be true.

The defence here is a double one. Some of the defendants claim under a previous will dated January 26, 1884, and a codicil of March 24, 1884. They, of course, contend that, at the time of making that will and codicil the doctor was perfectly competent to make it, so that they fix the time of his disability subsequent to this date. The other contestants, who are not mentioned in that will, of course date his inability far enough back to invalidate that will as well as the one now in question. The claimants under that will contend that in the month of May, 1884, he was bound over by a magistrate to answer a criminal charge, and they date his general failure of mind from that time; he, it is said, having been greatly affected by it. Why a charge by a loose woman should have had such an effect upon a man of his character and habits, is a little remarkable, for the grand jury ignored the bill; so that the result of the charge was a triumph for him, as it shows that, in the opinion of the grand jury, there was not enough in the charge even to put him on trial. From that date, a large number of witnesses have been called, to show his condition from time to time, his conduct, his acts, his sayings and doings, and the opinion of the many as to his mental condition; the object of this testimony being to establish the fact that at certain times he was unable to make a will, and that this inability included the time at which the will was made. It is for you to say whether this has been successful.

[The defendants concluded their case by the production of what is called expert testimony; that is, testimony not given in the usual manner by witnesses, who are only allowed to testify to what they know or saw, but called to give their own opinions on matters testified to by others. These gentlemen were of high character, and well known in the medical profession. The only one of them who ever saw Dr. Ruddach was Dr. S. Preston Jones. He had seen him at Kirkbride's, where he was a patient for six days, from the 27th of August to the 2d of September. The other experts had never seen him, but they are all quite positive that he had alcoholic dementia, a state of mind in which he was utterly incapable of intelligently transacting business or making a will. Dr. Jones thinks that he could not have sufficiently recovered to such an extent as would make him competent to transact business, or make a will, at any time since he last saw him, on the 2d of September, 1884, until the time of his death.] [15]

Among the witnesses who have testified in this case, were the well known real estate brokers, the Messrs. Sylvester. They had been for five years the men of business for Dr. Ruddach, and visited him on business, separately, ten or twelve days before his death, and two months after Dr. Jones had seen him. No one has pretended to say that they were not disinterested witnesses. That they evinced no favorable disposition to the plaintiff was quite evident.

· [The court here read ·at length from the testimony of the witnesses referred to.]

The statements of these two witnesses are statements of actual occurrences, and not scientific opinions.

[Dr. Price, who was called after the expert testimony had been called, says: "If these gentlemen had seen Dr. Ruddach and examined him themselves, I have no doubt they would be perfectly able to give an opinion, but I do not think their opinion is worth one fig, given as it was." Whether that is a correct estimate of the value of their opinions it is for you to say under all the evidence in the case.] [15]

As was said, however, by Judge HOUSTON: " The facts and circumstances are the primary evidence on which the jury must rely, and not the opinion of witnesses as to the soundness of mind, or capacity to make a will. That is, it is the opinion of

Charge of Court below.

the jury founded on facts and circumstances, which they believe to be proven, and not the opinion of witnesses, which is to decide the case." In this case, as in all legal investigations, no testimony is admitted, unless the judge considers it relevant to the issues which are being tried. The testimony is, therefore, to be considered as a whole, and you are to make up your minds from that, whether the plaintiff or defendant has satisfied your minds of the justness of his contention.

That Dr. Ruddach was for years a man addicted to drink and lust is undoubted, but that fact alone would not necessarily incapacitate him from making a will. If all people who drink liquor and are fond of women, are held to be incapable of making a will, I am afraid a great many people would die intestate. The question in this case is, Did these habits so affect his mind that, at the time he made his will, he was incapable of making an intelligent disposition of his property? He was a man in possession of a large property, and this he controlled and managed until the time of his death. [We have in Pennsylvania a law, which authorizes the court to issue a commission, to determine whether a person is a lunatic or an habitual drunkard, on the application of any one related to him by blood or marriage, or of any one interested in his estate. When he has no relative, by blood or marriage, residing within this commonwealth, then any disinterested person in the county may make the application. And the word "lunatic," it is further enacted, shall be construed to mean and include every person of unsound mind, whether he may have been such from his nativity, as idiots, or should have become such from any cause whatever. On the return of this inquisition, finding that the person is a lunatic or habitual drunkard, the court can commit the custody of the person or of the estate, or both, to such person as they may deem most suitable, who shall first give security in such sum as the court shall direct, with condition for the faithful performance of said trust, and duly to account, according to law, for all property that may come into his hands. This course, no relative by blood or marriage, no one interested in his estate, no disinterested person, ever thought it necessary to adopt. One of his nearest relatives, and most frequent visitors, Mr. W. A. Ruddach, of Norristown, of course, could not do so. for he has sworn that in his opinion

Dr. Ruddach was perfectly competent to take care of his property. The Messrs. Sylvester could not do so, for they knew he was competent, as he satisfied them by the directions he gave them in regard to the management of his estate. As to others, their anxiety about the safety of his property, and their concern as to the state of his mind, seem to have commenced after his death.] [16]

His was certainly not the case of an educated gentleman, who had suddenly and unguardedly fallen into bad company and dissolute habits. Whatever the company was, he deliberately selected it. The first house he selected for his home and his drug store was at Fourth and Lombard streets. He there boarded with his present wife and her mother, and he died in Gaskill street, where he boarded with the same persons, Mrs. Dixon being a saleswoman at Heller's store, as she now is. Mr. Fortin had known him for thirty years, and continued his friendly relations until his death. Mr. Joseph Butcher, in the employ of Joel J. Baily & Co., and his wife, for seven or eight years had been on intimate terms with him, and Mr. Kessler and his family for the same length of time.

That Dr. Ruddach desired to make a will, is testified to not only by Mr. Fortin, but by both the Messrs. Sylvester, whom he had several times asked to call on him for that purpose. Whether he did make this will, clearly knowing and understanding the extent of his property, the business in which he was engaged, and without undue influence, is the question you are to decide.

The plaintiff's counsel request the court to charge [inter alia] :

4. There is no sufficient evidence in this case of a general insanity on the part of Dr. Ruddach, and, therefore, the burden of proof is on the defendants to show that at the very time he executed the will he was not of sound disposing mind, memory and understanding, or that at that very time his free agency was destroyed.

Answer: This point is affirmed; exception.[3]

5. Unless the jury are satisfied that the evidence shows unsoundness of mind or undue influence, at the very time of executing the will, the verdict must be for the plaintiff.

Answer: This point is affirmed; exception.[4]

Charge of Court below.

19. If on considering all the evidence in the case the jury should be in doubt, they should incline in favor of the plaintiff on both the issues.

Answer: I answer this point as follows: Testamentary capacity is the normal condition of one of full age. It is with him who undertakes to call it in question, to establish it, not in a doubtful way, but in a positive manner.[18]

The following points are presented on behalf of the defendants, by Mr. Beasten:

1. That it is not requisite that such derangement of intellect should be proved as would amount to insanity to set a will aside, but that imbecility of intellect, though short of insanity, is sufficient for that purpose; and, if the jury find from all the evidence in the cause, that there was such imbecility of intellect, arising from the use of alcoholic liquors or chloral, or from any other cause or causes, as, in the opinion of the jury, rendered the testator incapable of appreciating, knowing, remembering and calling to mind the value and extent of his property, at the time of making and executing said will, or that there was then such imbecility as rendered him, in the opinion of the jury, not of sound and disposing mind, memory and understanding, with reference to his said property, then their verdict must be for the defendants.

Answer: This point is refused; exception.[5]

2. That it requires less undue influence and less fraud to procure a will unlawfully from a person of weak and impaired intellect, than from a person in full mental vigor; and that, in determining the question of fraud and undue influence, the jury may take into consideration the state and condition of mind of the testator at the time of making and executing the alleged will, the condition and relative situation of the testator and plaintiff, the situations, surroundings and condition of the testator himself, the nature and extent of his property, all the circumstances under which the will was made, and the provisions of the will itself; and if, in the opinion of the jury, the alleged will was procured by fraud or undue influence, which the alleged testator, in the condition which the jury may find he was, from all the evidence, at the time of making and executing said will was too weak to resist them, their verdict must be for the defendants.

Charge of Court below.

. Answer: This point is refused; exception.[6]

The following points are presented on behalf of the defendants, by Mr. Ashhurst.

1. If the jury believe that Dr. Ruddach was incompetent to make a will at any time before the alleged will was made, they should find for the defendants, unless convinced that he had recovered or acquired and retained capacity to make a will at the time he undertook to make it.

Answer: This point is refused; exception.[7]

2. When he that is at the point of death, and hardly able to speak so as he may be understood, doth not of his own accord make or declare his testament, but at the interrogation of some other answers, " Yes," or " I do so," such a testament is open to grave suspicion.

Answer: This point is refused; exception.[8]

. 3. A sane man may do what he likes with his own, but this liberty is not allowed to one who has given indications of mental unsoundness. In his case every provision must be strictly scrutinized, and every sign of partiality or injustice viewed with strong suspicion. That mental disorder, such as would render a testator incompetent to make a will, may arise as the sequel or accompaniment of bodily disease, and is often indicated by weakness of judgment, loss of memory, imperfect appreciation of one's relations to others, disregard of propriety, freaks, caprices, vacillation and change. And the evidence in this case for defendants in this case will, if believed, justify the jury in finding a verdict for defendants, on the ground of such mental disorder.

Answer: This point is refused; exception.[9]

4. If a man, after having attained mature life, undergoes a change of character and conduct, especially when connected with any derangement of the physical organism, it may well induce a belief that it is the result of some morbid condition of the intellectual faculties.

Answer: This point is refused; exception.[10]

6. That a revolution in character and conduct on the part of the decedent, whereby he adheres to what he has formerly shrunk from and rejects what he has formerly loved, is an indication of and may be ascribed to an unnatural, morbid and unsound condition of mind.

Arguments.

Answer: This point is refused; exception.[11]

7. Unsoundness of mind, evinced by a revolution in character, may co-exist with an apparent use of the faculties in many respects.

Answer: This point is refused; exception.[12]

8. That when the faculties of a man predisposed to mental disorder by inheritance, have been by long-continued indulgence in the sexual passions and protracted alcoholism, reduced to such a condition as described by the witnesses who saw Dr. Ruddach at the Pennsylvania Hospital, it should require very strong and satisfactory evidence to convince a jury that he could recover his senses sufficiently to make a will within a period of less than eighty days.

Answer: This point is refused, except as answered in the general charge.[13]

The jury returned a verdict in favor of the plaintiff, on both issues. A rule for a new trial having been discharged, judgment was entered, when the defendants took this writ,* specifying that the court erred:

1, 2. In the refusal of defendants' offers.[1 2]

3, 4. In the answers to plaintiff's points.[3 4]

5–13. In the answers to defendants' points.[5 to 13]

14. In the predominance given to the plaintiff's testimony, and in virtually ignoring and passing by the defendants' evidence, and particularly in reading Messrs. Sylvester's testimony to the jury, and the stress laid upon it.

15–17. In the portions of the charge embraced in [ ] [15 to 17]

18. In the answer to plaintiff's point.[18]

19. In the portion of the charge embraced in [ ] [19]

*Mr. Richard L. Ashhurst* and *Mr. F. Carroll Brewster* (with them *Mr. Bradbury Bedell, Mr. Henry F. Hepburn* and *Mr. Charles Beasten*), for the plaintiffs in error:

(1.) Upon the questions raised by the first and second assignments, counsel cited: 1 Wharton on Ev., §§ 196, 197; 2 Wharton on Ev., §§ 647, 702, 703; Waln v. Philadelphia, 99 Pa. 330; Williams on Executors, 24; Tyrrell v. Jenner, 2

*See Reichenbach v. Ruddach, 121 Pa. 18.

Hag. 84; Baxter v. Abbott, 7 Gray 71. (2.) Upon the questions raised by the third, fourth, seventh, thirteenth, seventeenth and eighteenth assignments, counsel cited: Collinson on Lunacy, 55; Shelford on Lunacy, 275 ; Swinburne on Wills, §§ 3, 6, 7 ; Williams on Executors, 17–30.; Ray's Med. J., c. 14, §§ 230, 246; Jarman on Wills, c. 3; Harden v. Hays, 9 Pa. 151; Leech v. Leech, 21 Pa. 69; Boyd v. Boyd, 66 Pa. 292 ; Landis v. Landis, 1 Gr. 248; Daniel v. Daniel, 39 Pa. 193; Hix v. Whittemore, 4 Met. 546 ; Gardner v. Gardner, 22 Wend. 526 (34 Am. Dec. 340) ; (3.) Upon the questions raised by the fifth, sixth, eighth, ninth, tenth, eleventh and twelfth specifications, counsel cited: Parrish v. Parrish, 41 Barb. 274; Wharton & Stille's Med. J., § 28, n. W ; Tawney v. Long, 76 Pa. 110; Wilson v. Mitchell, 101 Pa. 495; Leech v. Leech, 21 Pa. 67 ; Daniel v. Daniel, 39 Pa. 209; Dr. Ray's Report in note to Pidcock v. Potter, 68 Pa. 353. (4.) Upon the questions raised by the fourteenth, fifteenth, sixteenth and nineteenth specifications, counsel cited: McTaggart v. Thompson, 14 Pa. 155 ; Burke v. Maxwell, 81 Pa. 139; Washington Mut. Fire Insurance Co. v. Rosenberger, 3 W. N. 16; Penna. Canal Co. v. Harris, 101 Pa. 80; Reber v. Herring, 115 Pa. 599.

*Mr. Alex. Simpson, Jr.*, for the defendant in error:

(1.) Upon the questions raised by the first and second assignments, counsel cited : Clark v. Trinity Church, 5 W. & S. 266 ; Sitler v. Gehr, 105 Pa. 577; Smith v. Arsenal Bank, 104 Pa. 518. (2.) In considering the third assignment, counsel cited : First N. Bank v. Wirebach, 106 Pa. 37; Aurentz v. Anderson, 3 Pittsb. 310 ; Wharton & Stille's Med. J., § 61; McMasters v. Blair, 29 Pa. 298; Carpenter v. Carpenter, 8 Bush (Ky.) 283; Achey v. Stephens, 8 Ind. 411; Turner v. Rusk, 53 Md. 65 ; Redfield on Wills, 92–3 ; Gardner v. Gardner, 22 Wend. 526 (34 Am. Dec. 340) ; 1 Jarman on Wills, 5th Amer. ed. 97, note c.; Townshend v. Townshend, 7 Gill 10; Williams on Executors, 6th Amer. ed., 34; Hix v. Whittemore, 4 Met. 545. (3.) Upon the fourth specification, counsel cited: McMahon v. Ryan, 20 Pa. 329; Eckert v. Flowry, 43 Pa. 46 ; Thompson v. Kyner, 65 Pa. 368; Tawney v. Long, 76 Pa. 106; Wainwright's App., 89 Pa. 220; Wilson v. Mitchell, 101 Pa. 495. (4.) Upon the fifth and sixth assignments, counsel cited:

McMasters v. Blair, 29 Pa. 298; Stevenson v. Stevenson, 33 Pa. 469. Upon the fourteenth assignment, counsel cited: Johnston v. Commonwealth, 85 Pa. 54; Thompson v. Kyner, 65 Pa. 374; Pennypacker v. Pennypacker, 7 Cent. R. 532.

OPINION, MR. JUSTICE GREEN:

The record of the hospital for the insane contained an entry which indicated that the testator's father was admitted in 1849 to the hospital, because of intemperance continued for six months, and that he was affected with melancholia resulting from intemperance. As there was no proof, and no offer of proof, that this species of melancholia is hereditary, we cannot see the relevancy of the record entry. It may be, or it may not be, that this form of mental affection is transmissible by inheritance, but we cannot assume that it is, in the absence of proof, and therefore the jury would not have been justified in inferring it had the entry been admitted. The first and second assignments of error are not sustained.

The plaintiff's fourth point was affirmed without qualification. The first clause of the point declared that there was no sufficient evidence of general insanity of the decedent, and the conclusion expressed in the second and last clause, was, that therefore the burden of proof was on the defendants to show mental unsoundness at the very moment of execution. An unqualified affirmance of the whole point was a positive direction to the jury that the evidence was insufficient to show general insanity. In view of the large amount and serious character of the testimony given by the defendants, as to the testator's mental condition shortly anterior to the making of the will, particularly during the summer of 1884, when he became an inmate of the insane asylum, we think it was going too far to say there was absolutely no evidence of a general insanity sufficient for the consideration of the jury. The answer should have been qualified so as to subject the testimony to the action of the jury, and that if it failed to satisfy them that there was a condition of general insanity at any time before the will was made, then the burden of proof as to the testator's condition at the time of execution was on the defendants. We feel obliged to sustain the third assignment of error.

The fourth assignment is not sustained, as it is certainly true that the unsoundness of mind or undue influence which will defeat a will, must have been operative at the time the will was executed.

We do not sustain the fifth assignment because we think the defendants' first point is an overstatement of the essentials of testamentary capacity. It is certainly not the law that the testator must be capable of appreciating, and knowing, and remembering, and calling to mind the value and extent of his property at the time of executing his will. The language of the point is exceedingly broad. Literally it means that there must be an ability to remember and call to mind all the items of his property, and also to know and appreciate, as well as to remember, the value of each item or at least each subject of ownership, in order that the testator may reach the standard of the point. Persons having a large and diversified estate would be practically incapacitated from testacy, if so severe and exacting a standard as this were established. We question whether there is any improvement in the definition of testamentary capacity upon that given by Judge KING in 1853 in the case of Leech v. Leech, 21 Pa. 69, to wit: "A disposing mind and memory, in the view of the law, is one in which the testator is shown to have had, at the making and execution of a last will, a full and intelligent consciousness of the nature and effect of the act he was engaged in; a full knowledge of the property he possessed; an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty." This description of testamentary capacity has been many times approved and never questioned. While modifications of it may be needed in particular cases to meet particular facts developed, it contains all the substance of a correct general definition, and may at all times be expounded to juries as a guide to them in their deliberations with entire safety.

The second point of the defendants should, we think, have been affirmed. We see no objection to its postulates just as they are stated. Nor is the point in any degree involved or obscure. It is drawn with much care, with clearness of expression, and with entire accuracy as to its legal truth. Thus, considering it in detail, it is certainly true that it requires less

undue influence and less fraud to procure a will unlawfully from a person of weak and impaired intellect, than from a person in full mental vigor. It is equally true that the jury, in determining the question of fraud and undue influence, may take into consideration the state and condition of mind of the testator at the time of executing his will, the condition and relative situation of the testator and the plaintiff, the situations, surroundings, and condition of the testator himself, the nature and extent of his property, and all the circumstances under which the will was made, and the provisions of the will itself.

In illustration of the propriety of this point it cannot be overlooked that, while the plaintiff was in fact the testator's wife when the will was made, she was in all probability his mistress up to that time and for several years before. He so declared her to be in her presence and without contradiction from her, to the witness, James T. Thompson, and to the witness Broughton, he said she had been his mistress for thirteen years. In addition to this, the entirely uncontradicted evidence as to the manner in which they lived together, was highly persuasive, indeed quite convincing, that this was their true relation. The circumstances, both of the marriage and the will, were also of a very unusual and gravely important character as affecting the very question of undue influence. The marriage took place on November 13, 1884, the will giving all the property of the testator to the plaintiff was executed on November 15th, and on the 16th he died. At the time of the marriage he was confined to his bed, as he was also when the will was made, with the last and fatal sickness of which he died the next day. It was literally a death-bed marriage, and a death-bed will. That he was in an extremely enfeebled condition of body was the undisputed testimony of all.

That he was also extremely enfeebled in mind was alleged by the defendants, and that allegation was supported by a great mass of entirely disinterested, and, much of it, highly intelligent, and some of it highly skilled testimony. A very great number of distinct acts, transactions, facts, declarations, and conversations done and uttered by the deceased, which were quite inconsistent with his mental soundness, were given in evidence, and might have been received and acted upon un-

favorably to the will by any jury engaged in the trial of that question. The testator had made a will only a few months before, when he was certainly in a better condition both of mind and body, in which not a dollar of his estate was given to the plaintiff, a large part was given to a charity, and the remainder to relatives and friends. That will was the result of his personal dictation, and without doubt embodied his wishes with certainty. It is also a fact of importance that his estate was quite large, probably more than $100,000 in value. It was a fact entirely undisputed that the testator had for many years indulged in the excessive use of alcoholic stimulants and in excessive venery. The plaintiff's principal medical witness, Dr. Price, who attended him during his last illness and for some months before, was asked: " Q. What induced you to think, the first you saw of him, that his disease was incurable? A. Simply from his history, a long life of drinking and debauchery."

It is not necessary to review the testimony on this subject. It abounds with the usual disgusting details of a life of gross intemperance, profligacy, and sensuality. The results arrived in due time. In the summer of 1884 he was taken to St. Joseph's Hospital for a time, and after that to Kirkbride's Insane Asylum where he remained for several days. Dr. Jones, who was for many years in charge of the male department of that institution and saw him and treated him while there, testified, that he was in a state of dementia with delusions. When asked to explain what he meant by this he said: " It is a state of great weakness of mind. It is the condition into which most insane patients ultimately sink, in which there is a loss of reason, intelligence, and a weakening in short of all the mental faculties." This was from August 27th to September 2, 1884, less than three months before his death."

. The foregoing being a very brief mention of a part of the facts, either undisputed or very well supported by affirmative testimony, the matters of which the defendants' second point was predicated brought them conspicuously and compactly together, and required their submission for the consideration of the jury. Thus, the point asked an instruction that the jury might take into consideration " the state and condition of mind of the testator" at the time of making the will, " the

condition and relative situation of the testator and the plaint-
iff, the situations, surroundings, and conditions of the testator
himself, the nature and extent of his property, all the circum-
stances under which the will was made and the provisions of
the will itself." Most certainly all of these matters were en-
tirely, indeed, eminently, proper to be considered by the jury,
in determining the question of undue influence.

The marriage was suggested by another and not by the tes-
tator; it was contracted, and the will was made in the house
of the sole beneficiary, as to whom the defendants had a per-
fect right to argue, and ask for a finding, that she was the tes-
tator's mistress up to the moment she became his wife. In the
case of Dean v. Negley, 41 Pa. 312, we held that the mere fact
of the unlawful relation of mistress to a testator was enough
to justify an inference of undue influence, and that fact, to-
gether with the fact of the devise to her children, would be
enough to justify a verdict against the validity of the will.
During the largest part, nearly all, of the period of the inti-
macy between the testator and the plaintiff, she was the wife
of another man from whom she was separated, but not divorced.
If there was unlawful intercourse between them it was adul-
terous, and comes directly within the terms of the decision in
Dean v. Negley. Added to that was the fact, that by the
terms of the will, made almost in the article of death, in her
house, within her custody, and substantially in her presence,
drawn by a person who was at least a stranger to the testator,
the whole estate of the testator was given to the plaintiff to
the exclusion of all his relatives and of the deserving charity,
who had been the sole objects of his bounty in his former will.
This circumstance was considered of importance in the case
of Rudy v. Ulrich, 69 Pa. 177, commenting upon Dean v. Neg-
ley. While in the present case the fact that a marriage had
taken place prior to the will relieves the plaintiff from the
most serious risks which she would have encountered under
Dean v. Negley, it does not relieve the testamentary act from
the imputation of a continuance and a present exertion of an
undue influence, if the jury in view of all the facts of the case
inclined to such a belief. But from this opportunity they were
practically excluded by the refusal of the court to affirm the
second point of the defendants. We think the point should

have been affirmed just as it stood, and therefore sustain the sixth assignment of error.

In one sense the first of Mr. Ashhurst's points is true, because it includes the idea that the testator, although previously incompetent, had become, and was, mentally capable at the time of executing the will, and regarded in that manner the point is certainly correct. Yet the point is so drawn that it might well mislead a judge into the supposition that its real meaning was, that if at any one time in the testator's previous life he had become temporarily incompetent, no matter how briefly, the whole burden of proving a subsequent recovery and a capacity at the time of execution rested upon the proponent. This is certainly not the law; and, because we would not reverse on the ground alone of this one refusal, we will not say there was error in refusing the point in the language in which it was framed. The seventh assignment is not sustained.

The eighth assignment is not sustained because while the point was abstractly true there are no facts in the case which make it applicable.

We cannot sustain the ninth assignment because the first two clauses of the point which it covers are too strongly stated, and the point was simply refused as an entirety. It is not legally true that one who has merely " given indications of mental unsoundness " is not at liberty to do what he likes with his own, or that in such case every sign of partiality or injustice must be viewed with strong suspicion. Persons may easily give " indications " of insanity without in reality being insane, and they cannot be charged with testamentary incapacity for so unsubstantial a reason as that. Dr. Ray's report in Pidcock v. Potter, 68 Pa. 353, is not the opinion of the court.

We cannot sustain the tenth and eleventh assignments because the points which they cover are not sufficiently certain or specific to justify the affirmance of either. The change of character spoken of may be from bad to good, and certainly such a change cannot be regarded as indicating mental aberration of any kind.

The twelfth assignment is sustained because the point to which it refers is entirely correct and should have been affirmed just as it stood.

The point covered by the thirteenth assignment is not a legal

proposition, nor is its deduction an inference of law from the facts of which it is predicated.  The law cannot know whether it would require very strong and satisfactory evidence to convince a jury that a man, conditioned as the testator was described by witnesses to be at the Pennsylvania Hospital, "could recover his senses sufficiently to make a will within a period of less than eighty days."  The jury alone could know what their conception was as to Dr. Ruddach's mental condition when at the hospital, and they only could know how much and what kind of testimony could remove their impressions upon that subject at any particular time.  We do not see what relevancy or legal propriety there is in suggesting a period of eighty days as a possible limit within which a radical change of mental condition could not take place, when there was abundance of testimony as to what his actual condition was at the end of that period, and ample opportunity to deliver direct testimony on that subject.  The idea of the point seems to be to substitute a theoretical inference as to what the testator's condition ought to be, or might be expected to be, at a given time, for specific evidence as to what it actually was.  Courts have nothing to do with declaring propositions such as this, and the point was properly refused.

The fourteenth assignment is of much more importance and we think it is sustained.  Of course when the learned court below selected the testimony of two witnesses on one side upon one subject, and read it at much length to the jury, it would naturally be inferred by the jury, that in the opinion of the court that testimony was of controlling importance; and when there was an entire omission to read any of the evidence on the other side having a contrary tendency, they would naturally consider that in the opinion of the court such opposing testimony was of no efficacy and was not entitled to any consideration from them.  If the testimony upon one side of a controverted question of fact is made prominent and conspicuous in the charge, common fairness requires that equal prominence should be given to opposing testimony having a contrary tendency.  A careful reading of the charge impels us to say that we think it amenable to the criticism of this assignment.  Though there was much statement and considerable argument, in the charge, of the testimony favorable to the plaintiff, and

of the theories upon which her side of the case was submitted, we do not discover the least allusion to the great bulk of the defendants' testimony, and only an allusion to the testimony of Dr. S. Preston Jones, who testified in the most emphatic manner, giving reasons which seem to be of grave importance and founded upon ample observations, for the conclusions which he reached and announced. But there was beside all this a great amount of testimony to specific acts, conversations, and declarations of the testator, indicating not merely a weak but a disordered mind, established by what seems to be entirely credible testimony, and to all or any of this there is not the slightest allusion in any part of the charge. There was considerable testimony that the testator was subject to delusions of an extraordinary and absurd character, but no reference to any of it was made in the charge. There was much testimony as to his excessive use and abuse of intoxicating liquors, and the effect thus produced both upon his mind and body. The only reference in the charge to this branch of the defendants' testimony is the following: "That Dr. Ruddach was for years a man addicted to drink and lust is undoubted; but that fact alone would not necessarily incapacitate him from making a will. If all the people who drink liquor and are fond of women, are held to be incapable of making a will, I am afraid a great many people would die intestate." That such a remark as this might be made with propriety in a case where the testimony showed nothing but an occasional indulgence in liquor or sexual intercourse, may not be questioned, but to dispose in this way of the entire mass of the testimony in this case, on these subjects, showing such a complete breaking down of the testator's physical powers and a very serious impairment of the powers of his mind, was not in our opinion an adequate or a correct treatment of the testimony.

Edward Lynch, an attendant at Kirkbride's, described his condition thus: "He was very peculiar; more so than any patient I had seen there. His mind was entirely gone; one time he admitted to me he had been a doctor, and that is the only thing I could get from him. He was incoherent, and he was full of delusion. I heard him say once that there had been men all around him going to shoot him—men all around his room—and he used to get very noisy in his talk. He ap-

peared to have imaginary objects before him all the time."
Strawbridge, a watchman at the same place, said: "His talk
was at times loud and incoherent; at times he acted more like
a man frightened and in fear of something, seeming to shrink
from some possible enemy, deprecating or apprehending some
injury, and he would make such noises or exclamations as
would indicate fear or dread." After he left Kirkbride's in
the latter part of September, 1884, he was staying at the Del-
aware Hotel. Hugh Jones, the proprietor, after describing
some of his peculiarities, said: "He required exercise, and he
would sit there from morning to night in a chair taking no
exercise, and I would say to him, 'Doctor, why don't you go
out and take exercise?' He said, 'I am afraid; don't you see
those fellows watching me. The moment I go out they will
arrest me.' I tried to convince him there was no person there
to disturb him, but I could not." The same witness further
testified: "I recollect one day, he put his hand in his panta-
loons pocket and pulled out I should judge from two dollars
to four dollars in silver, but I do not know exactly the amount,
and he said to me, 'Mr. Jones, this is all the money I have in
the world. I must get something to do or I will starve.' He
was very much distressed. I tried to convince him it was a
fallacy but I did not succeed." Dr. S. Preston Jones, the
physician in charge at Kirkbride's, said: "He was stupid and
dull. I could get no responsive replies from him to my ques-
tions. He could not give me any account of his feelings, or
tell me anything about himself, who he was, where he was
and so on. . . . . I then observed him for the next two or
three days more closely or quite closely, and became satisfied
he was of unsound mind." Plumley, another witness, testified
after giving many other facts and particulars, as follows:
"Q. Toward the last, when he became weaker, was he harder
to manage by Mrs. Dixon, or was he more easily managed by
her? A. He was easier managed. Q. Explain how that was.
A. All she would have to do would be to say to him when he
wanted to do anything, 'Will, you must not do that,' and he
would drop like a child. It made no difference what it was."
. . . . . "Q. What did he say about wanting you to bury him,
how would he express himself about it? A. He said that he
was poor—that he had nothing, that they had got every cent

of his money, that they had got all he had and he wanted me to bury him." This was when he was fast in bed shortly before his death.

These are a very few of the matters in evidence as to his mental and physical condition. Other delusions and other facts were shown tending to establish the effect of his habits of dissipation and debauchery upon his mind and body, and they were far too numerous in the aggregate, and of too serious a character, to be passed over with so slight a reference in the charge as heretofore stated. A large amount of expert testimony was given by physicians of experience, character, and ability, on behalf of the defendants. It was all disposed of in the charge by repeating a remark of Dr. Price, the plaintiff's medical witness, that he had no doubt the defendants' medical witnesses were competent to give an opinion if they had seen Dr. Ruddach, but given as it was, he did not think it worth a fig. Such a treatment of that testimony by the court in charging the jury would naturally lead the jury to treat it in the same way. The writer has read that testimony and feels obliged to say that it was entitled to a far more serious consideration. A long hypothetical question, embodying the facts in evidence, was propounded to the medical witnesses. All of them expressed the opinion that, upon the facts stated in the question, Dr. Ruddach was of unsound mind with scarce a possibility of recovery at the time the will was made. Dr. Wood, one of these witnesses, being asked to state his reasons for his opinion said: "In the first place the history is plain of a long continued and excessive abuse of alcohol and of venery —causes which lead to mental deterioration and may lead to absolute dementia, or loss of mental power. . . . . The symptoms were in a word those of chronic alcoholic dementia at that time, and were clearly not those of acute alcoholic poisoning, or of delirium tremens. The history of the case during the man's stay in the Pennsylvania Hospital is clearly that of chronic alcoholic insanity with dementia. The history of the case so far as it is afforded after that time is, that during his stay in the hotel the characteristic symptoms of alcoholic dementia were present and those of delirium tremens certainly not at all. Such a state I believe could scarcely be recovered from, even if it had lasted but for a few days. Having, how-

ever, lasted for a succession of weeks and the man dying a few months afterwards, or a short time afterwards, it is almost impossible there should be a recovery with mental capacity."

Some idea of the extent of the testator's habit of drinking is conveyed by the testimony of one of the saloon keepers. He was asked: "Q. During the last year of his life how frequently do you suppose he would take drinks at your place a day? A. I could safely say twenty. Q. Do you mean to say that he would average twenty a day? A. Yes, and I guess a great many more than that. I am positive of twenty. Q. What kind of liquors did he drink? A. Whiskey and champagne. Q. Was he in the habit towards the latter part of the time of getting whiskey at your place for nights? A. Yes, sir; he always used to take a small flask home with him on a night, saying that he couldn't sleep without it. Q. What would he put in it? A. Whiskey." When it is considered that this was only one of the places he visited, it is not difficult to understand the effects which resulted upon the testator's mental and physical condition.

We have made these few references to the testimony simply to illustrate what seems to us the incomplete character of the charge of the court in dealing with the case. In Burke v. Maxwell, 81 Pa. 139, the present Chief Justice in delivering the opinion said: "When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty, under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially, that it should not be one sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him." In the case of McTaggart v. Thompson, 14 Pa. 149, we said: "In addition, the defendants have just reason to complain of the one-sided character of the charge. It is objectionable because it resembles the argument of the advocate, rather than the impartial survey of the judge." In Penna. Canal Co. v. Harris, 101 Pa. 80, we said: "The main complaint is that the case was not justly and fairly submitted to the jury; that the evidence and theory of the defendant were

fully and prominently presented, and the strength of the plaintiff's case was so presented as not to call their attention to the main points in the plaintiff's case. . . . . It is error to confine the attention of the jury to one view of the case, where there is more than one which they should consider." After referring to some of the testimony given by the plaintiff the opinion proceeds: "If this evidence be correct it should be submitted to the jury as having great force, yet the evidence was incidentally referred to by the judge, and in a manner not calculated to induce them to give it a proper consideration." We have so frequently held that giving undue prominence to the testimony on one side of a case is error, that a reference to the cases is unnecessary. The fourteenth and fifteenth assignments are sustained.

We are not referred to any testimony proving that no proceedings in lunacy were commenced against the testator in his lifetime, and we do not know whether such was the fact or not. This being the case, we think there was no propriety in the remarks of the learned court upon that subject, winding up with this statement in regard to the contestants: "Their anxiety about the safety of his (testator's) property and their concern as to the state of his mind seem to have commenced after his death." Such a remark would naturally tend to create a prejudice in the minds of the jury against the defendants, and for that reason it is out of place in a charge. Even if there had been proof that no proceedings in lunacy were commenced against the testator in his lifetime, we do not think that circumstance would be of any weight in view of the facts of this case. It is true that in Irwin v. West, 81* Pa. 157, it was held that the omission to commence such proceedings might have some weight to be considered by the jury, but that was said with reference to the facts of that case. In the present case the testator had no near relatives—no parents, no children, or lineal descendants—and nearly all of such relatives as he had lived out of the state. His nearest relative in Pennsylvania, W. A. Ruddach, a cousin living at Norristown, said he did not have knowledge of a proceeding in lunacy, but that he thought there was such a commission; he had heard so but could not tell when. As the testator was neither an idiot nor a lunatic, and the worst effects of his mode of life did not be-

come so very serious until shortly before his death, we do not see that the omission to commence proceedings was of any weight whatever as against the good faith of the present contest over his will, and in any other point of view such omission was not a proper subject of remark. We, therefore, sustain the sixteenth assignment of error.

As to the seventeenth and eighteenth assignments, we think it altogether likely that the learned judge did not mean to convey the idea that proof of incompetency or undue influence must be positive as distinguished from circumstantial, in the character of the testimony offered, but nevertheless he did so charge in literal terms, and of course it was error. There is no rule of law that allegations of mental unsoundness or undue influence in feigned issues on wills must be established by positive evidence, and hence to say that it must, in a charge to a jury, tends to give the jury an erroneous idea of the quality or character of proof required. We are, therefore, obliged to sustain these assignments.

We do not think the nineteenth assignment is of any material consequence and, therefore, do not sustain it. The words, "overwhelmingly established," in the charge in relation to Mrs. Dixon's conduct towards the testator are, perhaps, too strongly stated, in view of some of the evidence, but the whole subject is one of very minor consequence, and we would not feel at liberty to reverse on that ground.

Judgment reversed and a new venire awarded.

