## Murray *v.* Pittsburgh Athletic Company, Appellant, et al.

Argued October 9, 1936. Before SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*James J. Burns, Jr.,* for appellant.

*Clyde A. Armstrong,* of *Thorp, Bostwick, Reed & Armstrong,* with him *Donald W. Ebbert,* for appellee.

*John M. Reed,* for additional appellees.

OPINION BY MR. JUSTICE MAXEY, November 23, 1936:
Plaintiff, while a spectator seated in the grandstand at Forbes Field, Pittsburgh, watching a baseball game, was injured when the free end of an expanding iron gate slid or moved across an aisle and struck his knee, causing injuries which gave rise to the present suit against appellant, lessee of the premises. The additional defendants, Jacobs Brothers Company, were brought upon the record by defendant on the ground that the former were liable over to it on an agreement of indemnity. At the trial a verdict was directed in favor of the additional defendants, and the jury returned a verdict in favor of plaintiff against defendant, the appellant, in the sum of $7,500. Complaint is made of the directed verdict, of the excessiveness of the verdict, and of denial of appellant's motions for a new trial and for judgment n. o. v.

Plaintiff was sixty-five years old on the date of the accident, May 29, 1931. On that afternoon he paid for a general admission ticket and took his seat in the first row of that section, next to an aisle at his left. The grandstand sloped towards the field of play from where plaintiff was sitting, the seats being arranged on tiers in the usual manner, each row higher than the one in front. The aisle to his left contained steps. Immediately in front of plaintiff's seat was an iron bar or railing which served to divide the reserved seat section from those entitled to general admission. This was supported by an iron post located at the rear left-hand corner of the aisle seat in the last row of the reserved section in front of plaintiff's, and of the same height, possibly three feet. Across the aisle, and on the same level as plaintiff's tier was attached a collapsible iron gate, which could be folded close against the steel column so as not to obstruct the aisle when it was desirable to keep the aisle open. This gate was four or five feet in height and was designed so that when elongated across the aisle, to form a barrier between the two sections of the grandstand, an iron upright at its end fitted into two U-shaped "lugs" attached to the railing post by the seat, where it would remain of its own accord, unlatched. There was, however, no channel or guide in the concrete floor of the aisle, and no wheel attached to the gate to carry the gate straight across the aisle and into the "lugs" placed on the railing post to receive it. There was no dispute as to the nature of the gate's design and construction; several photographs were introduced in evidence depicting it in detail.

Plaintiff and his business associate, who was sitting in the seat next to him, testified as to the happening of the accident. Near the end of the game plaintiff was leaning forward in his seat, his arms resting on the railing in front of him, his feet apart, so that his left knee was slightly to the right of and about four or five inches behind the iron post which formed the terminus of the

gate when extended across the aisle. An usher, a boy employed by defendant, was sitting in the seat just in front of plaintiff, in the last row of the reserved section. His duty was apparently to see that the gate was closed, for he had been engaged all afternoon in closing it in a proper manner, as people passed up and down the aisle. A young boy, selling popcorn and candy, referred to in the evidence as the "candy boy," employed not by appellant but by the additional defendants, passed through the gate and failed to close it. The usher called to him to return and do so. A fair inference from the testimony is that he did return and impart some movement to the gate, although the evidence on the point is not clear, since plaintiff and his witness were both watching the game and were not paying attention to what the boy was doing. The latter did not testify at the trial. At all events, the next moment the free end of the gate swung across the aisle and, instead of reaching its proper terminus, it extended into the space between plaintiff's row of seats and the railing, a few inches behind the post, and struck plaintiff's knee a glancing blow, then bounced off against the post and came to rest. Plaintiff's trousers were torn at the point of impact against his knee, he suffered severe pain and was forced to leave the game. He first, however, went below the grandstand to report the accident to some official, and he and the official then went back to examine the gate. Plaintiff immediately visited his family physician and was treated for the injury, which was substantial at the time and has since proved to be permanent in character.

Two expert witnesses were called by plaintiff and testified as to the results of their examination made in October, 1932, of the gate which caused the injury, plaintiff having previously testified that it was then in the same condition as when the mishap occurred. It was shown that by actual test, although the aisle which the gate was designed to close off was only five feet wide, the gate would expand almost automatically—if not checked

by some intervening object,—a distance of thirteen feet two inches into the space between the row of seats where plaintiff was sitting and the railing in front. Moreover, it had a tendency to expand in the direction of this open space, instead of moving directly across the aisle to the post intended as its terminus. The reason for this was the fact that the other end of the gate was not properly attached, in a perpendicular line, to the steel column across the aisle. There was testimony by two men to the effect that even though no one pushed or moved the gate or sought to close it, it would move of its own weight across the aisle into the space occupied by plaintiff. Both these witnesses were officials of companies which manufacture gates of a similar type of construction. It was testified that if there had been a channel or runway in the concrete floor of the aisle, which would guide a wheel attached to the bottom of the gate, or if automatic stops had been attached to its folding members, the accident could not have happened. Gates of proper design, these witnesses said, are so equipped. On the gate in question there was a place where such a wheel was obviously intended to be attached, but there was no wheel there. One of the experts said: "The gate—we have gates, our company, similar—seemed to be a make-shift. The wheel on the bottom of the gate that fits into the guiding slot on the step was missing. There was nothing there to keep it in a direct path. It just shot out." The other gave his opinion that the gate was in fact constructed to close a thirteen-foot, instead of a five-foot opening, and had more than twice the amount of steel in it necessary for the purpose intended.

Appellant's chief contention is that the verdict of the jury cannot be allowed to stand, because it was based on only a guess or conjecture as to the cause of the accident. Neither plaintiff nor the witness who sat beside him at the time of the accident, it is argued, could tell whether the gate slid across the aisle and struck plaintiff of its own motion, or whether the "candy boy" not employed

by defendant, caused the injury by negligently slamming
the gate shut when the usher called to him to do so.

We think that the evidence that the accident happened
because of the improper condition and operation of the
gate, while somewhat circumstantial, was nevertheless
persuasive. It is clear that the accident could not have
occurred had a suitable gate, properly equipped, been
maintained by defendant. There was not sufficient evi-
dence in the record to show that the "candy boy" was
the person whose negligence set in motion a dangerous
mechanism maintained by defendant's want of proper
care and who thus became the efficient, proximate cause
of the accident. All that was shown was that just as the
gate struck plaintiff's knee the candy vendor was re-
moving his hand from the gate. This might have shown
that the boy had something to do with closing the gate
but it gave rise to no inference that he pushed it roughly,
flung it or slammed it against plaintiff's knee. The ex-
pert testimony was that the gate would slide across the
aisle and into the open space occupied by plaintiff of its
own accord and without the intervention of any force.

This phase of the case was ably handled by the learned
trial judge, who submitted the question of intervening
negligence to the jury, in a charge entirely fair to de-
fendant, as follows: "If you find that the plaintiff was
injured because of the manner in which the candy ven-
dor acted, if it was his fault, if it was his negligence,
that the plaintiff was injured, then, of course, the de-
fendant company could not be held liable. . . . If you
find that the gate was negligently maintained but that it
was the intervention of the candy vendor, that it was be-
cause of what he did, that he handled the gate in a negli-
gent way himself, and had it not been for his negligence
and carelessness the plaintiff would not have been hurt,
your verdict will still be for the defendant. If, on the
other hand, you find that the gate was negligently main-
tained and find that the intervention of the candy boy,
of the candy vendor, was an innocent intervention and

that it did not matter whether he or anyone else was there, that anyone closing the gate normally would have brought about the same result, if you find that the plaintiff was struck by the gate because of the negligent maintenance of that gate regardless of who may have closed it, then your verdict would be for the plaintiff."

Under all our decisions, if the evidence indicated that the negligence of a third party intervened to such extent that defendant might be exempted from liability, and thus raised a question as to the proximate cause of the accident, that question was properly submitted to the jury. The portion of the charge quoted above was in conformity with our ruling in a very recent case: *Helmick et al. v. South Union Twp.*, 323 Pa. 433, 185 A. 609. See also *Stone v. Phila. et al.*, 302 Pa. 340, 153 A. 550; *Hoffman v. McKeesport*, 303 Pa. 548, 154 A. 925; 45 C. J. 1322; A. L. I., Restatement of the Law of Torts, secs. 447, 453.

Appellant in support of its view cites several decisions which are inapplicable here. In all the cases cited the evidence either failed to afford any explanation of how the accident happened or fell short of establishing a specific negligent act of defendant which by any logical process could be said to account for the injury sustained. Thus in *Penna. R. Co. v. MacKinney*, 124 Pa. 462, 17 A. 14, plaintiff, while a passenger on defendant's train, sitting near a window, was struck in the eye by some hard substance, probably a piece of coal. No negligent causal act or omission on the part of defendant was proved. Plaintiff in *Wolk et al. v. Pittsburgh Hotels Co.*, 284 Pa. 545, 131 A. 537, sought to recover damages when struck on the head by a falling milk bottle, by showing that in the past such objects had been seen on window sills of the hotel near which he was sitting in a parked automobile. There was no proof that the object fell from a hotel window or that the negligence of the management rendered such a mishap possible. The other cases referred to in appellant's brief, *Devine v.*

*Bell Telephone Co. of Pa.,* 298 Pa. 460, 148 A. 522; *Sumey v. Fayette County,* 298 Pa. 93, 147 A. 851, and *Klein v. Phila. Rural Transit Co.,* 320 Pa. 548, 183 A. 43, are distinguishable on grounds equally plain. So also is *Niziolek v. Wilkes-Barre Ry. Corp.,* 322 Pa. 29, 185 A. 581.

None of the foregoing cases is applicable to the proof of negligence in the case before us. Here it was shown that defendant maintained the gate in such a state of disrepair and so ill-equipped from the standpoint of safety that unless closed with painstaking care by someone familiar with its operation it would prove a menace to anyone seated where plaintiff was at the time. It may have been for that reason that defendant required its employee, the usher, to stand by and see that the gate was properly closed, which in this instance he failed to do. The case cannot be distinguished in principle from the decision in *Darrah et al. v. Wilkinsburg Hotel Co.,* 318 Pa. 511, 178 A. 669, where a hotel was held liable for the fall of a flower box, perched at the edge of a balcony above a ballroom floor, which was precipitated upon plaintiff below by the thoughtless act of an onlooker in the balcony.

There is an alleged error in the charge of the trial judge. The latter adverted to the doctrine of "exclusive control" of the instrumentality causing an accident, as applied in such cases as *Durning v. Hyman,* 286 Pa. 376, 133 A. 568, and *Sellmer v. Ringling,* 62 Pa. Superior Ct. 410, and referred to in *Wright v. Straessley,* 321 Pa. 1, 182 A. 682, but he did not charge the jury that proof of slight negligence on the part of defendant, together with the happening of the accident itself and its surrounding circumstances, would afford an inference of its want of due care sufficient to sustain a verdict against it. Actual negligence having been shown by plaintiff, the reference complained of could not have prejudiced defendant's case in the minds of the jurors. The trial judge did instruct the jury that defendant was not an insurer

of the safety of its premises, but impliedly warranted that its grandstand was safe for the purpose intended, except as to unseen and unknown defects which could not be discovered by the exercise of due care. As applied to plaintiff, who paid his admission price to see the game, such a charge could not be objected to, as our cases demonstrate: *Haugh et al. v. Harris Bros. Amusement Co.*, 315 Pa. 90, 172 A. 145; *Sheets v. Sunbury & North. Elec. Ry. Co.*, 237 Pa. 153, 85 A. 92; see also *Sellmer v. Ringling*, supra, and *Cathcart v. Sears, Roebuck and Co.*, 120 Pa. Superior Ct. 531, 183 A. 113.

The charge that the verdict of $7,500 was excessive finds no support in the evidence. Plaintiff's injuries were and still remain substantial in character. His knee has been permanently incapacitated for efficient usefulness. He has suffered and will continue to suffer considerable pain. The business in which he is and was engaged at the time of the accident requires his constant supervision. Plaintiff is the president and manager of a corporation which manufactures patented wire slings for transporting extremely heavy objects, the nature and design of which is understood by plaintiff alone and necessitates his close attention at the shop during fabrication, as well as many trips to interview customers, solicit orders, and conduct tests as to the requirements of individual purchasers. There was proof that plaintiff is now able to walk only with a cane and that even with its aid his knee pains him constantly, requires rest and frequent medical treatments, and occasionally buckles under him or "locks" as he walks about the streets, causing him to fall and to seek physical assistance from passers-by. This condition, his physician testified, will continue the rest of his life.

After the accident plaintiff was confined to his home for several weeks, under treatment by his physician, and wholly incapacitated from attending to his business. For a considerable period after he was able to ride to his office he could work only intermittently. He has

never recovered his full vigor, nor is he likely to in the future. An operation, it was shown, would not prove helpful. As a consequence the business of his company has suffered a severe decline in income. Plaintiff's earnings depended directly on profits of the business. Prior to the accident, plaintiff earned a monthly average of $206; since the accident this has been reduced to an average of $78 a month, covering the period to the time of trial, in November, 1935. Allowing something for probable decline in the company's business from natural causes during the depression years, and for the fact that during some weeks of this period plaintiff was disabled by another mishap which occurred on a trolley car, nevertheless plaintiff's financial loss has been undeniably substantial. His earnings will probably be similarly diminished in the future. Evidence as to loss of earnings was introduced solely to furnish the jury with a rational basis for measuring plaintiff's loss of earning power, along with the other evidence tending to show incapacity. Taking into consideration the permanent nature of the injury, past and future pain and suffering, medical expenses, partial disability, and loss of earning power, we cannot say that the lower court erred in refusing to reduce the size of the verdict.

Appellant, by a separate appeal, complains of the action of the court below in directing a verdict in favor of the additional defendants, Jacobs Brothers Company, whom appellant brought upon the record under the provisions of the Scire Facias Act of April 10, 1929, P. L. 479, as amended, alleging that the additional defendants were alone liable for the injuries, since the person whose negligence caused the accident, the candy vendor, was at the time employed by them and under their supervision and control. The writ of scire facias was not issued until July 20, 1933, more than two years after the accident. Hence the writ, as the averment of liability then stood, alleging negligence on the part of an employee of the additional defendants, was clearly barred by the two-

year statute of limitations applicable to trespass suits for personal injuries, under the Act of June 24, 1895, P. L. 236, and our ruling in *Bowers v. Gladstein,* 317 Pa. 520, 178 A. 44, and for that reason the writ could have been struck off.

Subsequently, on November 9, 1933, the writ of scire facias was amended by adding an averment that the additional defendants were liable over to the original defendant, not only because of their employee's negligent act, but also by reason of an alleged indemnity agreement, whereby the Jacobs Brothers agreed to indemnify and hold harmless appellant "of and from all actions and injuries arising out of [the additional defendant's] activities." In their answer to the scire facias the additional defendants admitted the existence of the agreement. They were represented by counsel who was present at and participated in the trial. If defendant has a cause of action against the Jacob Brothers on the indemnity agreement, it sounds in contract, not in tort, and hence the two-year statute does not bar it. But such a cause of action, based on contract, is separate and distinct from the cause of action forming the basis of plaintiff's suit, which is the injury caused plaintiff by defendant's negligence. Under the decision in *Jones et al. v. Wohlgemuth,* 313 Pa. 388, 169 A. 758, the additional defendants were improperly joined, and on application the scire facias could have been stricken off for this reason. In that case we said, at page 390: "The Act of 1929, supra, was not intended to complicate legal proceedings by combining entirely separate causes of action in one suit. By the wording of the act, defendant may bring in as an additional defendant 'any person alleged to be liable over to him *for the cause of action declared upon.'* [Italics supplied.] In the present case, the liability, if any, of the parents to appellant arises, not on account of the injuries received by the minor plaintiff (which are alleged to have resulted from defendants' negligence) but by virtue of the indemnity agreement. . . . One

action is in trespass and the other in assumpsit. The causes of action are separate and distinct and no sufficient reason exists for joining them in one proceeding,— indeed, such result was never contemplated by the Act of 1929, supra."

The judgment entered was against defendant and in favor of the additional defendants. Being final, the proceeding, though irregular, as it now stands would be a bar to further action which defendant might undertake against the additional defendants on the indemnity agreement. We think the proper disposition of this feature of the case requires that this judgment be reversed and the case remanded to the court below with instructions to enter a nonsuit as to the additional defendants, thus removing the bar of the judgment: *Cleary v. Quaker City Cab Co.*, 285 Pa. 241, 132 A. 185; *Fine v. Soifer*, 288 Pa. 164, 135 A. 742. In this manner defendant, the present appellant, will be entitled to pursue its claim under the indemnity agreement that the injuries to plaintiff, for which defendant has been held liable, arose out of the "activities" of the additional defendants, any recovery against the latter on the ground of their employee's negligence being now barred. Appellant is entitled to its day in court on this issue, if it can sustain its contention, since the finding of the jury against defendant on the main issue of negligence does not technically preclude the possibility of defendant's showing that the additional defendants' "activities" were the genesis of the injuries for which it will have paid compensation.

The judgment in No. 199, in favor of plaintiff and against defendant, is affirmed at the cost of appellant.

The judgment in No. 278, in favor of the additional defendants and against defendant, is reversed, and the record is remanded to the court below with instructions to enter a nonsuit upon the writ of scire facias joining the additional defendants as parties to the suit.