## Patti's Estate.

82

Argued March 8, 1938. Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD,
PARKER, JAMES and RHODES, JJ. 

*Peter P. Zion,* with him *Albert S. Rosenberg, Albert H. Friedman* and *Joseph Marzzacco,* for appellant.

*J. Harry Morosini,* for appellee.

OPINION BY PARKER, J., October 12, 1938:

This appeal is from an order of an orphans' court refusing to award an issue devisavit vel non and sustaining an order of a register of wills admitting to probate an alleged will of Fortunato Patti. The writing was attacked upon three grounds, namely, (1) that at

the time of the execution of the will Patti did not possess testamentary capacity; (2) that the writing was procured by undue influence exerted by Constance Corozzi and her husband, John Corozzi, beneficiaries thereunder; and (3) that the writing was not executed in the manner required by statute. The questions presented are interrelated as will appear from a reference to the facts.

We are reminded as we approach consideration of the questions involved that the appellant must assume a heavy burden in attempting to reverse the orphans' court for refusing to award an issue and that the applicable rules are rigid. In *DeLaurentiis's Estate,* 323 Pa. 70, 77, 186 A. 359, Mr. Justice STERN has reviewed the relevant cases and has shown that a party is not entitled to have an issue submitted to a jury "merely because he produces enough evidence to make out technically a prima facie case"; that a case should not go to a jury when a court in the exercise of a sound legal discretion would not sustain the verdict; that it is the duty of the judge hearing the case "to refuse to present the question to a jury, unless he feels the ends of justice call for a verdict against the will, or he is so uncertain on this point that he could conscionably sustain a finding either way on one or more of the controlling issues involved" (*Mark's Estate,* 298 Pa. 285, 286, 148 A. 297) ; and that the function of the judge of the orphans' court "is not to constitute himself the jury, that is, to decide the case as he would if acting in the capacity of an ultimate fact-finding tribunal. His function is to decide whether there is a substantial dispute upon a material matter of fact, and such a dispute exists if a verdict that might be reached by a jury, even if at variance with his own opinion, would not have to be set aside as judicially untenable because contrary to the weight of the evidence."

We will first state the facts that were established by

the proponents' witnesses, which facts should have been taken as true by the judge of the orphans' court and are accepted by this court. Fortunato Patti was severely injured in the mines on October 12, 1936, and was immediately taken to a hospital where he remained until he died on Friday, November 13, 1936. Among other injuries he suffered four fractures of the pelvis, a suspended fracture of the spine and a urethra tear. On November 9, 1936, an insurance agent, Aldo Lepri, who spoke Italian as well as English, called at the hospital to see Patti for the purpose of having him change the name of a beneficiary in an insurance policy and at that time Patti requested Lepri to procure for him an attorney to draw a will. Lepri called an attorney, A. I. Coplan, Esq. Lepri and Mrs. Corozzi, one of the proponents, met Mr. Coplan at the hospital the following morning, November 10. At the request of Lepri and Mrs. Corozzi, a will was prepared by Mr. Coplan from notes furnished by Lepri who stated that he procured the instructions from Patti. As Patti spoke and understood only a few words of English and the draftsman did not speak the Italian language, it was necessary that the data for the will be furnished in English to the draftsman by an Italian. The paper prepared by Mr. Coplan was dated November 10, 1936, and provided for the burial of decedent and gave decedent's real estate located in this state and household goods as well as his entire residuary estate, which included real estate holdings in Italy, to Constance Corozzi and her husband, John Corozzi. Between 10 A. M. and 11 A. M. of that day, three friends of Patti were summoned to his bedside at the hospital to act as witnesses. These men were Italian by birth and one of them was, like Patti, a Calabrian and spoke his dialect. When the paper was explained to Patti he refused to sign it and informed the witnesses that he did not wish to be bothered. The parties left the hospital about noon and Lepri was

called back about 2 P. M. Lepri then secured two witnesses, one of whom spoke Italian, and the papers were executed in a manner to which we will refer later. Neither of these witnesses had any previous acquaintance with the decedent. This brings us to a consideration of the remaining evidence.

The proponents undertook to prove that the will was executed in accordance with the statutory law but furnished no direct evidence bearing on the testamentary capacity of the decedent or as to undue influence exercised upon him. The appellant attacked the will on the three grounds mentioned at the outset of this opinion and there was practically no contradiction of such evidence.

Fortunato Patti was unmarried and left to survive him a full brother and two sisters, all living in Italy, and a half brother, a United States Customs guard, who resided in Philadelphia. He was on good terms with his brothers and sisters and frequently sent money to his unmarried sister and some money to the other sister and brother who lived in Italy. The proponents, Constance and John Corozzi, were strangers to the blood of Patti but resided in a house owned by decedent.

Dr. Arnese, who spoke Italian and attended decedent from the day of the accident until his death on November 13, was called as a witness by the appellant and could fairly be described as an unwilling witness. He testified that the condition of his patient from the start was serious, that he was called to see Patti about 7:45 A. M. on November 10 and immediately ordered an injection of digitan. He then gave this description: "At that time the patient was in a chill, and for about fifteen minutes we had warm blankets and hot water bags on him trying to get rid of the chill and trying to get him to react; his pulse was imperceptible; you couldn't get his pulse at all that time; his temperature was 98.3 drop, or the temperature I mean dropped from 98.3

which was normal for him and it went down to about 95, and there was no heat at all in his body hardly and the body had to have stimulants to try to get him to react." The witness then was called to the operating room of the hospital but returned between 9:30 and 10 A.M. He testified that at that visit the chill was gone and the pulse had improved, but the temperature had not gone up any; that "he was in a very weakened condition and he didn't react to the treatment we gave him and he was practically dying." The doctor saw the patient again at 3 P. M. and there was a slight improvement but the temperature had not gone up. He also stated that the temperature did not go above 96 during the remainder of the patient's life and described his condition as bad, and said that the patient was about ready to pass out. He stated that Patti could barely speak in a whisper, that he asked for a bowl of soup when he had just finished a bowl of soup, that he asked for a hypodermic when he had just had one. Patti complained that the nurses were allowing him to die when the witness knew that every attention was being given to him. The doctor further stated: "He was weak, very very weak physically ...... For one thing he could just about whisper; he had to force himself to just whisper." Dr. Arnese gave it as his opinion that Patti's condition would affect his memory but the witness positively declined to state whether or not the testator had testamentary capacity. The doctor heard Lepri testify as to the instructions given by decedent for the making of a will. In that connection we have the following question and answer by the physician: "Q. Was Patti able, according to your understanding of his condition, to carry on at 10:00 o'clock that morning, a conversation as alleged by Aldo Lepri here? A. Not in such a very weakened state, he was in a very weakened condition, and his voice was just about a whisper; not more than a whisper, and it would weaken him to

talk, and he could only talk in a very low whisper." The doctor was in and out of the room between 10 A. M. and 3 P. M. and was requested to act as a witness to the will, but he declined to do so.

Phillipo Racobaldo, a witness for the appellant, a friend of Patti and a native of Calabria, corroborated the doctor as to the patient's physical condition. This witness testified that it was very difficult for an Italian who did not understand the decedent's dialect to converse with him. When he went into the room of the dying man between 10 A. M. and noon, the will was read over and the witness called Patti's attention to the conditions of the will. He stated that Patti communicated his wishes and replies by movements of his head. When the witness had finished explaining the will to Patti, the witness asked him if he wished to sign it and he shook his head indicating no. Patti then, either by a movement of his head or a low whisper, indicated very positively that he did not wish to have anything more to do with the will and the witness and his two companions, who had intended to act as witnesses to the will, withdrew from the room and left the hospital. During this interview there was a significant occurrence. Mrs. Corozzi joined in the conversation and asked why he had changed his mind about making the will and urged, in support of her desire to have him sign the will, that she had invested some money in the house. Racobaldo then asked Patti if that was true and Patti indicated that it was not true. Mrs. Corozzi did not then make any reply and she failed to take the stand at the hearing in the orphans' court. Racobaldo, who had visited the decedent almost daily, returned to the hospital about 3:30 P. M., after the alleged execution of the paper, and found Mrs. Corozzi still there. He did not observe any change in Patti's condition. He stated that Patti asked for a pear when he had a pear in his hand and asked for a glass of water when the

glass was still filled with water and was in his hand.

The two additional fellow countrymen who were called to witness the will in the morning corroborated the statements of the doctor and Racobaldo, but stated that they left the room before Racobaldo did.

Antonio Patti, the appellant, a half brother of the decedent, corroborated the physician as to the physical and mental condition of the decedent. That witness visited his brother four or five times within ten days prior to the execution of the alleged will. He stated that on only one of these occasions was his brother able to recognize him and converse with him and then only with great effort in a low whisper.

A. I. Coplan, Esq., the scrivener, was called by the proponents as a witness in rebuttal. Although he was present during the morning when the first attempt was made to have the paper executed he stated that he was unable to recall any of the circumstances detailed by Racobaldo and the other two proposed witnesses, but did not deny that what they stated was true. The substance of his reply to inquiries was that his memory was not good as to that subject. The proponents asked him no questions as to the testamentary capacity of the decedent.

It was shown by the testimony of proponents' witness that Mrs. Corozzi joined in securing Mr. Coplan to draft the will, and it was shown by several witnesses that she was in and about the hospital from early in the morning of November 10 until the early evening. She was present when Mr. Coplan arrived at the hospital and joined in searching for the proposed witnesses to the will and was close at hand at the time of the attempted execution in the morning and at the time of the alleged execution in the afternoon when it appears that she was urging upon Patti, a dying man, that he execute the will as it had been prepared.

The proponents relied alone on evidence tending to

show the execution of the paper offered in accordance with §2 of the Wills Act of 1917, P. L. 403 (20 PS §191). It was shown by two witnesses that the writing was read to Patti in English and Italian, as he understood very little English, that he attempted three times to sign his name but was only able to make a scrawl which bore some resemblance to Fortunato, and that the name "Fortunato Patti" was then written by one Aldo Lepri. That signature was witnessed by two strangers to Patti, Chris Tomaino and Patrick Gebert. Lepri testified that Patti requested him to sign his, Patti's, name for him. Tomaino testified as follows: "Q. Give us the exact words that Mr. Lepri used as near as you can remember them? A. Mr. Lepri said 'Is it all right for me to sign your name to this will'? That's about as close as I can get to it. Q. And what did Mr. Patti say to that? A. He shook his head yes, meaning yes, up and down he shook his head. Q. But there were no words used in the conversation? A. He tried to speak but it was only a whisper and you couldn't make out what he was saying." Gebert testified that he could not understand anything said by Patti as he spoke just in a whisper and the witness did not understand Italian.

The appellant has devoted considerable time to the contention that the paper was not executed in accordance with the provisions of the Wills Act of 1917 in that the name was not signed by Lepri at the "express direction" of Patti. Section 2 of that act provides, in part, as follows (20 PS §191) : "Every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express direction; and, in all cases, shall be proved by the oaths or affirmations of two or more competent witnesses; otherwise, such will shall be of no effect." There is no doubt that the express direction to a party to sign his name for him must be

proved by two witnesses: *Greenough v. Greenough,* 11 Pa. 489.

We will assume, for the sake of argument, that Patti abandoned his attempt to execute the paper by signing the will with his own name. (See *Plate's Estate,* 148 Pa. 55, 23 A. 1038; *Knox's Estate,* 131 Pa. 220, 18 A. 1021.) If we assume that Patti answered "Yes" to Lepri's unambiguous question, "Is it all right for me to sign your name to this will?", that was an "express direction" to so sign his name. A different situation was presented in *Barr v. Graybill,* 13 Pa. 396, relied on by appellee, where the contention was that silence gave consent. If there had been no other complaint to the order of the court below than that the name of the alleged testator had been signed after an inquiry as to his wishes and not pursuant to a direction in which the conversation had been initiated by Patti, we would find no merit in the appeal. It is not important how the conversation started provided the express direction was communicated to the one signing for the testator. However, the circumstances under which the alleged will was executed are pertinent to the other questions raised.

In the situation disclosed here we cannot divorce the questions of undue influence and testamentary capacity. "The condition of mind of a testator alleged to have been unduly influenced, although of testamentary capacity, is important in determining whether the act was the result of the fraudulent arts practiced upon him": *Miller's Estate,* 179 Pa. 645, 655, 36 A. 139. However, we will first consider the question of testamentary capacity. To be of a disposing mind and memory, under the law, one must be possessed at the time of making the will of a "full and intelligent consciousness of the nature and effect of the act he was engaged in; a full knowledge of the property he possessed; an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to par-

ticipate in his bounty": *Leech v. Leech,* 21 Pa. 67, 69;
*Reichenbach v. Ruddach,* 127 Pa. 564, 590, 18 A. 432.
There was uncontradicted evidence which we cannot ig-
nore that for ten days prior to the execution of the
disputed writing Patti had been in a serious physical
condition, threatened with immediate dissolution; that
for considerable periods he was irrational or in a semi-
conscious state; that his memory was seriously impaired
so that he could not call to mind matters that had oc-
curred within a few minutes; that when he was able to
converse he could only whisper and then in such in-
audible tones that one at the foot of his bed could not
understand him. These conditions were shown to have
existed immediately prior to his refusal to sign the
paper in the morning and immediately after his signing
in the afternoon. It would not be contrary to reason
if a jury accepted the testimony that Patti did not
know the fact that he was then holding a glass of water
in his hand and asked for water; that he asked for
something that had just been given him; that he had
just been given a powerful stimulant by his physician
yet did not react to medication or treatment; that, as
the doctor testified, his memory was bad or seriously
impaired, and, in short, that he was then dying, and
should then conclude that he did not possess testament-
ary capacity. We would hesitate to find that there had
been such an abuse of discretion on the part of the
orphans' court if that were the only question raised or
those were the only facts presented, but in view of the
additional circumstances there was such a dispute as to
Patti's condition of mind and memory as should be
submitted to a jury.

When we consider the mental capacity of Patti at
the time of the alleged signing, together with the evi-
dence as to the persons that were assisting him and the
circumstances in connection with the preparation and
execution of the paper, a different picture is presented.

We then find a native of Calabria who spoke a dialect that was difficult for an Italian not a Calabrian to understand. He was dependent upon Lepri to transmit his instructions to a scrivener who did not understand Italian. During the entire day Mrs. Corozzi was present in the room with Patti or nearby, except for an interval when she joined in searching for persons to witness the will. She was urging the execution of the will as it was drawn, and we must assume that she was at that very time presenting a false claim as a reason for executing the will just as it was drawn. We so assume because there was positive testimony by Racobaldo to the effect that she claimed in Patti's presence to have contributed to the cost of his real estate, which statement Patti denied in her presence, and because she then failed to take the stand to deny such conduct. When a native Calabrian explained the paper to Patti he refused to execute it, but after the friends of Patti had left the room the alleged execution took place. The proponents' own witness, the scrivener, testified that he wrote the will at the request of Lepri and Mrs. Corozzi. By the paper Mrs. Corozzi and her husband, strangers to his blood, were given his entire estate to the exclusion of his next of kin to the support of whom Patti had contributed and with whom he was then on friendly terms. In any view, the paper was executed under great stress by a dying man. Yet Mrs. Corozzi failed to take the stand and testify to what actually took place when she was present and the proponents failed to offer any other evidence in rebuttal, except that the will had been read to Patti in English and then translated for him before it was executed.

Unfortunately, there was a lack of direct evidence as to the general relationship which the proponents bore to the testator. Consequently we cannot apply the well settled rules with relation to the burden that rests upon a confidential adviser. Nevertheless, the prin-

ciples of those cases and the reasons on which they are grounded are pertinent.

Where one is charged with the exercise of undue influence upon another in the making of a will for the benefit of the actor in such exercise, but derives no benefit, or a very inconsiderable benefit from the will, "there must undoubtedly be evidence of direct influence exerted at the time of making the will. ...... But where, being an entire stranger—having no claims from lawful relationship—he derives a very considerable benefit from the act, such direct proof ought not to be, and is not required. ...... General evidence of power exercised over the testator, especially if he be of comparatively weak mind from age or bodily infirmity, though not to such an extent as to destroy testamentary capacity, will be enough to raise a presumption, which ought to be met and overcome before such a will can be established. ...... 'Where the party,' says Mr. Redfield, 'to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation' ": *Boyd v. Boyd,* 66 Pa. 283, 293. "Where a testator is shown to be of weak mind, without regard to the cause from which that weakness has arisen, though it be not sufficient in itself to wholly destroy testamentary capacity, and the person by whom, or under whose advice, the will has been written, being a stranger to the testator's blood, receives a legacy or bequest, large as compared to the testator's estate, the burden shifts from the contestants to the proponents of the will, to prove affirmatively both testamentary capacity, and that the testator acted with a full knowledge of the value of his estate": *Caldwell v. Anderson,* 104 Pa. 199. "It is only where the testator is of weak mind, arising from physical or mental ailment that a presumption of undue influence arises when a stranger to his blood procures a large legacy": *Llewellyn's Es-*

*tate,* 296 Pa. 74, 82, 145 A. 810; *Geist's Estate,* 325 Pa. 401, 191 A. 29; *Buhan v. Keslar,* 328 Pa. 312, 194 A. 917.

Wills are usually prepared according to instructions given to the scrivener privately when no one else is present; and to hold that in the case here presented it was sufficient for the proponents to prove the formal execution of the paper in the presence of witnesses and then throw upon the contestants the burden of proving undue influence, misrepresentation or mistake "would open the door wide for the arts of the cunning and designing to succeed in their nefarious purposes." The words of the Supreme Court in *Cuthbertson's Appeal,* 97 Pa. 163, 172, are pertinent: "Every man who draws a will in his own favor, under such circumstances, should know that he will be required to prove affirmatively all the circumstances connected with the drawing of the will, and that it must appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property and the amount he was giving to his confidential adviser. It has been decided that the beneficiary himself is a competent witness to prove the will. He cannot complain, then, that the rule is hard or unjust which requires him to make it clearly appear that the gift to him was the free, intelligent act of the testator."

As we have indicated, we may not here assume at the present time under the evidence that the beneficiaries in this will were either of them confidential advisers of the testator, but they are in a similar position. It is not important for present purposes whether we speak of the burden of proof that was upon Mr. and Mrs. Corozzi, or of a duty on them to go ahead with the evidence, or of a presumption against them, or whether we assume from their silence that their evidence would have been favorable to the appellant. We are now concerned in an examination of the weight of the evidence produced rather than with the order of proofs. The

facts remain that in any view of the case the mental capacity of Patti was seriously impaired and a stranger to his blood had an active part in the preparation and execution of the paper which gave his entire estate to strangers, Mr. and Mrs. Corozzi. They have not testified themselves nor furnished one iota of evidence tending to show that the paper was his true and free act, uninfluenced and unrestrained. These facts weigh so heavily against the proponents that we are convinced this is a proper case for the submission of the issue to a jury. With a full appreciation of the heavy burden that is here upon the appellant, we are of the opinion that there is a substantial dispute as to the testamentary capacity of Patti and as to the undue influence alleged to have been exercised by Mrs. Corozzi, and that if a jury should find in favor of the appellant a court "could conscionably sustain" such finding. The appellant made out much more than a prima facie case. We feel that it was an abuse of judicial discretion to refuse the issue.

It has been said many times that one may by will dispose of his property as he sees fit and that he is entitled to act on his own prejudices, but the law is rigid in insisting that one of weak mind, whether from inherent causes or by reason of illness, shall not be imposed upon by the art and craft of designing persons. The law has imposed a burden on strangers to the blood of a testator who receive extraordinary benefits and who are shown to be in a position where they might exercise a nefarious influence on one so weakened in mind by disease or illness to make the fullest disclosure of all the circumstances connected with the making and execution of a will.

The decree of the orphans' court is reversed with directions to award an issue to the court of common pleas to try by jury the questions of fact as to whether at the time of the execution of the writing the decedent

was a person of sound mind and memory and whether the writing was procured by undue influence, duress, constraint, or fraud practiced upon the decedent by John or Constance Corozzi. Costs to abide the result.