## Stewart's Estate

608

*Cecil P. Harvey,* for proponents.
*John Lamon,* for contestants.

LADNER, J., December 7, 1945.—This was a trial of an issue devisavit vel non before Hunter, J. The issue awarded and submitted to the jury was whether the alleged paper writing, probated as the last will and testament of John Stewart, deceased, was procured by undue influence. The special verdict of the jury answered the question in the affirmative. Thereafter, proponents moved for a new trial and for judgment non obstante veredicto. At the argument, counsel for proponent withdrew his motion for a new trial, so that all that remains before us is his motion for judgment n. o. v.

In the recent case of Morrish's Estate, 156 Pa. Superior Ct. 394 (1944), it was held that the Act of April 22, 1905, P. L. 286, 12 PS §681, regulating motions for judgment n. o. v. is equally applicable to trials by jury in the orphans' court as in common pleas court. Therefore in determining the propriety of a judgment n. o. v.

the controlling question is, would binding instructions for the party moving have been proper at the end of the trial; and, in deciding that point, the evidence must be read in the light most favorable to the party receiving the verdict of the jury, that party being given the benefit of every fact and inference from the facts pertinent to the issues involved which may legitimately be drawn from the evidence: Smith v. Standard Steel Car Co., 262 Pa. 550 (1919); Hostetler v. Kniseley, 322 Pa. 248 (1936). With this as a guide we must review the evidence adduced on the part of the contestant in light of the familiar principle controlling the award of issues in this court which makes it the duty of a judge to refuse to present a question to the jury unless he feels the ends of justice call for a verdict against the will, or he is so uncertain on this point that he could conscionably sustain a finding either way on one or more of the controlling issues involved: Noble's Est., 338 Pa. 490 (1940). We note also that this case was heard once before by Judge Hunter as hearing judge to determine whether an issue should be awarded on appeal from the register. The evidence produced before him was substantially the same as that produced before the jury, and on it the issue presently tried was awarded by him.

We have, nevertheless, reviewed the testimony produced before the jury and have come to the conclusion that the verdict must be upheld and the motion for judgment n. o. v. dismissed.

The contestant's evidence shows that the alleged testator, John Stewart, hereinafter referred to as decedent, died August 5, 1943, possessed of real and personal property to the value of $8,000. The alleged will, dated October 10, 1941, bequeaths to decedent's two brothers, Andrew Stewart and Charles Stewart, $200 each, provided they survive the testator, and if not, the bequest was to become part of the residuary estate. Only one brother survived, Andrew Stewart, who is

the contestant here. The rest of the estate is given in equal shares to the two residuary legatees, Margaret J. Layton and Isabella Logan Kruger, who are strangers to the blood of the decedent but nieces of decedent's deceased wife. The said Margaret J. Layton, and her husband, John E. Layton, are designated executors.

The will was written by an attorney at his own office pursuant to instructions given him by the said John E. Layton, executor, and husband of Margaret J. Layton, one of the principal legatees. The attorney never saw the decedent, never received any instructions from him direct, and was not present at the execution. The alleged will contains the usual testimonium clause in which it is certified by the subscribing witnesses that the decedent signed, sealed, published and declared the same as and for his last will and testament, and that they affixed their signatures as witnesses in his presence and at his request and "in the presence of each other".

At the trial, all of the three subscribing witnesses, Mary C. Buckley, Len Hammerslay and Katherine Hammerslay, testified that they did not know and were not told the document they were called upon to witness was a will. The two Hammerslays signed the document in their own apartments, not in the presence of the testator and not at his request, nor in the presence of Mary C. Buckley. Mary C. Buckley testified that she did not recall whether she was requested to sign the document by the decedent or by Mr. Layton. More details of the testimony of each subscribing witness will be mentioned later but at this stage it is sufficient to point out that unlike the majority of the cases, the irregularity of the execution supervised not by the attorney who wrote the will but by a layman who had a personal interest therein as executor, and a greater indirect interest as husband of a legatee of one half of the estate, removes from proponent the support of disinterested subscribing witnesses whose testimony is usually a

weighty factor in sustaining a will. This is especially true in cases where, as here, the alleged testator was shown to have been aged, physically and mentally weak, senile, and easily imposed upon.

On behalf of contestant it was shown that the decedent was 77 years of age at the time of his death. Dr. Ralph B. Killian, who had been his family physic·· for upwards of 17 years, testified that he attended the decedent on an average of one to four times a mont during the period in which the alleged will was signed; that he saw decedent at his home on September 8, October 6 and November 8, 1941 (the alleged will being executed on October 10, 1941, and instructions to draw alleged to have been given several days before) ; that he was suffering from diabetes and nephritis, and had been for some time; that he had a chronic muscular heart disease and low blood pressure; that after the death of decedent's wife, which occurred ten days before the date of the alleged will, decedent's condition became aggravated. He seemed like a lost sheep. He did not know which way to turn. He was senile, had some mental deterioration, was forgetful, did not know what he wanted to do; he was indecisive as to his actions. However, sometimes he was mentally alert, other times he was way off, continued the doctor. Later during the trial when it was desired to recall the doctor, but he was unavailable, it was agreed by counsel that if the doctor were recalled to the stand, and if the question were asked him, whether in his opinion the mental condition of the decedent was such that he could have become the victim of designing persons, the docto·· would have answered "yes".

Sarah N. MacLean, a witness for contestant, testified that she had known the decedent for 40 years, was a close friend of both decedent and his wife, visited them frequently, performed many services for the decedent, and after decedent's wife's death, cooked his

meals and shopped for him. She testified that he was bewildered after his wife's death; he could not talk; did nothing but cry and his memory was poor.

Kathryn Hammerslay, one of the subscribing witnesses' deposition was taken and from it, it appears that she and her husband (another of the subscribing witnesses) occupied the second story apartment in decedent's house. She testified that she did not see the decedent but was asked to sign the paper by John Layton; that he did not tell her what the paper was, but handed it to her folded over so that she could not tell from its appearance what it was. She testified that she had no conversation with Mr. Layton but merely signed her name because her husband had signed his.

The testimony of her husband, Lewis Hammerslay (whose signature appears as a subscribing witness above that of his wife), at the hearing on appeal was read to the jury by agreement of the parties. It is to the effect that the will was brought to him by Mr. Layton *who told him it was a power of attorney* and asked him to witness the decedent's signature, which he recognized and therefore attested. He also said that the paper was folded so that he could not tell what it was. Neither he nor his wife saw the decedent sign as the decedent did not come up to their apartment nor did the Hammerslays go down to his.

The third subscribing witness, Mary Ella Buckley, was called by the proponent. The testimony of this witness, though called by proponent, was more favorable to the contestant. She testified in substance she was employed by decedent to do day's work for him; that she was in the kitchen on the day the alleged will was signed and she was called to the dining room but could not say whether she was called by the decedent or by Mr. Layton, nor who asked her to sign the paper. The paper was not signed by decedent in her presence but decedent was present with Mr. Layton when she

signed. Nothing was said by either of them at the time. After she signed she went back to the kitchen. On cross-examination she testified that no one told her what kind of paper it was. She did not know it was a will. She could not say whether it was read to decedent. The fair inference from this witness's testimony is that she was called in after decedent had signed and without being told what the document was, signed in a perfunctory sort of fashion and went back to the kitchen.

Beatrice N. M. Zeman testified that she knew the decedent and his wife all her life; that she was a goddaughter, visited them frequently, and that after the wife's death she did all the correspondence for the decedent with his brothers in Ireland, and at his request sent money-orders to them every three months. She testified that after decedent's wife's death he was in a dazed, bewildered condition.

The contestant then called as for cross-examination John E. Layton, the executor who had the will prepared and who supervised its execution. He and his wife were named executors therein, and his wife a beneficiary of one half of the estate. He testified that for two or three days before the signing of the will that the decedent wanted to see him, and upon his calling, told him that he wanted a will drawn. Layton recommended that he get a lawyer, but decedent said he didn't want a lawyer, and gave Layton the instructions for the preparation of the will. These instructions were on a memorandum not, however, produced, and he took them to Paul D. Zentmyer, Esq., a member of the Philadelphia Bar, who prepared the will and gave it to Mr. Layton. Mr. Zentmyer did not know the decedent, and never saw him either before the will was drafted, nor at the time of its execution. Layton testified the will was signed between 10 and 11 o'clock on the morning of October 10, 1941, in the dining room

of the decedent's home. He testified that he read the will to the decedent, and Mary Buckley signed it as a witness in the presence of the decedent, but did not recall whether Mrs. Buckley was present when the will was signed. He admitted that decedent was not present when Mr. and Mrs. Hammerslay, the other subscribing witnesses, signed. He denied that he influenced the decedent in any way. He also denied and contradicted the testimony of the Hammerslays to the effect that he told them the document he asked them to witness was a power of attorney. He admitted that he carried the will away with him immediately after the execution but explained that the decedent gave it to him to hold for safe-keeping. His testimony that the decedent was in perfectly normal mental condition and that it was not weakened but that at the time of the making or execution of the will he was as good as he had been for several years, does not agree with the testimony of the physician.

In his opinion awarding the issue, Judge Hunter quoted at length from the late Mr. Justice Parker's excellent review of the requirements to set aside a will for undue influence, which appear in Patti's Estate, 133 Pa. Superior Ct. 81, in which court Justice Parker then sat, part of which reads (p. 93):

"Where one is charged with the exercise of undue influence upon another in the making of a will for the benefit of the actor in such exercise, but derives no benefit, or a very inconsiderable benefit from the will, 'there must undoubtedly be evidence of direct influence exerted at the time of making the will. . . . But where, being an entire stranger—having no claims from lawful relationship—he derives a very considerable benefit from the act, such direct proof ought not to be, and is not required. . . . "Where the party", says Mr. Redfield, "to be benefited by the will has a controlling agency in procuring its formal execution, it is uni-

versally regarded as a very suspicious circumstance, and one requiring the fullest explanation" '; Boyd v. Boyd, 66 Pa. 283, 293. . . . 'It is only where the testator is of weak mind, arising from physical or mental ailment that a presumption of undue influence arises when a stranger to his blood procures a large legacy': Llewellyn's Estate, 296 Pa. 74, 82, 145 A. 810; Geist's Estate, 325 Pa. 401, 191 A. 29; Buhan v. Kesler, 328 Pa. 312, 194 A. 917."

Here we have both physical and mental infirmity which, according to the decedent's own physician made him liable to become the victim of designing persons.

That Mr. Layton was greatly interested in the alleged will can hardly be doubted. The same principle of identity of interest which, the law holds, renders either spouse incompetent to testify where the other seeks to establish a claim against a decedent's estate would seem to apply with equal force to a case where a husband drafts or procures the execution of a will in which his wife is given a most substantial portion. Under such circumstances Mr. Layton was in much the same position as the draftsman of the will in Cuthbertson's Appeal, 97 Pa. 163, 172, where it was indicated that the duty of such person was to secure the intervention of a disinterested lawyer, trained to discern the condition and alertness of the decedent's min thereby guaranteeing freedom of action and full knowledge on the testator's part.

At the argument and in his brief, the learned counsel for proponent rested heavily upon the fact that as contestant called John Layton as for cross-examination, under the familiar rule of Dunmore et ux. v. Padden, 262 Pa. 436, and cases following it, contestants are bound by Layton's testimony. Therefore, since Layton testified that he exerted no undue influence and that the alleged testator directed him to have a will drawn, together with instructions as to its contents, and as

there is no countervailing evidence contradicting what Layton testified to as having taken place, binding instructions were inescapable. We are quite familiar with the rule in Dunmore et ux. v. Padden, but that rule is not without exception, and the most important one is that well stated by the late Justice Sadler, in Burke, exec. v. Kennedy, 286 Pa. 344, to the effect that a witness called for cross-examination may be contradicted by circumstances as well as statements of others contrary to his own; that there may be a degree of improbability in the statements themselves to deprive them of credit however positively made, and that the jury may reject them although uncontradicted by direct evidence. The interest of the witness so called must be considered as affecting his credibility and if the calling of such witness is necessary as being the only living person who could testify as to the essential question at issue, such circumstance is to be considered. So, where the testimony of a witness is full of contradictions, the story improbable, and it is shown that the witness has a substantial interest in the result of the suit, and is the only living person with knowledge of the transaction involved, it would be error for the court to accept his statement as verity and not to submit the testimony to the jury. See also Marach v. Kooistra et al., 329 Pa. 324; Boyle v. Pennsylvania Railroad Company et al., 346 Pa. 602.

Probably in no class of cases is it more important for the fact trier to be permitted to find the necessary contradiction of a witness called on cross-examination from surrounding circumstances, inherent probabilities, self-interest, etc., than in the cases arising in this court where so frequently the only living witness must be called. The instant case is a clear case where it was necessary to call Layton to find out the details and circumstances surrounding the execution of this will because of the manner in which the signatures of the subscribing witnesses were obtained. The protection

usually afforded testators by subscribing witnesses who sign with a knowledge of the important document they are called upon to witness, was here lacking. Thus, from the necessity of calling Layton, his substantial interest, the flat contradiction of his testimony on the important point that he secured the signatures of the two Hammerslay witnesses by misrepresenting the nature of the document to them, that he concealed the nature of the document by keeping it folded when they signed, and his act in immediately carrying the will off and beyond the reach of the testator, all make it a clear case where the jury had the right to accept o reject such parts of this witness' testimony as appealed to their reason in the light of the surrounding circumstances and probabilities of the case.

The learned counsel for proponent also relies much on Morrish's Estate, 156 Pa. Superior Ct. 394, where the decree of the court refusing to set aside a verdict of the jury, finding that a will had been procured by undue influence, was reversed. There one of the beneficiaries who had a will drawn for the decedent in accordance with her instructions, gave it to two of the decedent's friends who took the will to decedent and in the privacy of her room read it to her. Then only after she approved was the beneficiary called in and was present at its execution, along with the two friends of decedent who had read the will to her and who signed as subscribing witnesses. The difference between the two cases needs no further comment. We all agree with the learned trial judge that the verdict was conscionable and just and should be sustained. The motion n.o.v. is refused and judgment now entered on the verdict setting aside the will.

Counsel for contestants will prepare an appropriate decree, submit it to opposing counsel for approval as to form, and present it to the writer of this opinion for execution.